# United States Court of Appeals
## For the First Circuit

No. 22-1062

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO
RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO; THE
FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS
REPRESENTATIVE FOR THE PUERTO RICO SALES TAX FINANCING
CORPORATION, a/k/a Cofina; THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE
EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE
COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE
PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY; THE FINANCIAL
OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS
REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC POWER AUTHORITY
(PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO
RICO, AS REPRESENTATIVE OF THE PUERTO RICO PUBLIC BUILDINGS
AUTHORITY,

Debtors,

LA LIGA DE CIUDADES DE PUERTO RICO,

Plaintiff, Appellant,

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO;
AUTORIDADE DE ASESORIA FINANCIERA Y AGENCIA FISCAL (AAFAF);
CENTRO DE RECAUDACION DE INGRESOS MUNICIPALES (CRIM);
ADMINISTRACION DE SEGUROS DE SALUD DE PUERTO RICO (ASES); LUIS
M. COLLAZO RODRIGUEZ, in his Official Capacity as Administrator
of the Sistemas de Retiro de los Empleados del Gobierno y la
Judicatura del Estado Libre Asociado de Puerto Rico,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Laura Taylor Swain,[*] <u>U.S. District Judge</u>]

———————

Before

Barron, <u>Chief Judge</u>,
Lipez and Montecalvo, <u>Circuit Judges</u>.

———————

<u>Guillermo J. Ramos Luiña</u>, with whom <u>Tanaira Padilla Rodríguez</u> was on brief, for appellant.

<u>Lucas Kowalczyk</u>, with whom <u>Timothy W. Mungovan</u>, <u>John E. Roberts</u>, <u>Martin J. Bienenstock</u>, <u>Mark D. Harris</u>, <u>Guy Brenner</u>, and <u>Proskauer Rose LLP</u> were on brief, for the Financial Oversight and Management Board for Puerto Rico, appellee.

<u>Ashley M. Pavel</u>, with whom <u>John J. Rapisardi</u>, <u>Maria J. DiConza</u>, <u>Peter Friedman</u>, and <u>O'Melveny & Myers LLP</u> were on brief, for AAFAF, ASES, and Luis M. Collazo Rodriguez, in his official capacity as administrator of the Sistemas de Retiro de los Empleados del Gobierno y la Judicatura del Estado Libre Asociado de Puerto Rico, appellees.

<u>Fernando Van Derdys</u> for CRIM, appellee.

<u>Edwin Quiñones</u> and <u>Quiñones, Arbona & Candelario</u> on brief for the Senate of the Commonwealth of Puerto Rico, amicus curiae.

<u>Jaime L. Sanabria Montañez</u> and <u>ECIJA SBGB</u> on brief for United States Representatives Nydia M. Velázquez, Alexandria Ocasio Cortez, and Ritchie Torres, amici curiae.

———————

July 25, 2024

———————

———————

[*] Of the Southern District of New York, sitting by designation.

**Lipez**, **Circuit Judge**. This case follows an unsuccessful effort by Puerto Rico to enact legislation -- known as "Law 29" -- to eliminate the burden on Puerto Rico's municipalities of complying with the Commonwealth's reformed public pension funding scheme. In previous litigation, the Title III court overseeing Puerto Rico's debt restructuring issued an Order and Opinion (the "O&O") declaring Law 29 "a nullity" and "of no effect." The correctness of that determination, which was never appealed, is not directly at issue.

Instead, plaintiff-appellant La Liga de Ciudades de Puerto Rico ("La Liga") insists that the O&O did not authorize the Financial Oversight and Management Board for Puerto Rico ("the Board") to recover the funds the municipalities had retained under the auspices of Law 29 for approximately one year, before the O&O took effect. Interpreting its own prior order to reach a contrary conclusion, the district court[1] granted defendant-appellees' assorted motions to dismiss, some on the merits and another for lack of standing. In the end, we affirm on the merits. Before doing so, however, because of an issue noted at oral argument by the panel and advanced by our colleague in a dissent, we must

---

[1] For the sake of clarity, when referencing the court that authored the O&O in the prior Law 29 litigation, we use the term "Title III court," and when referencing the court that authored the order now on appeal, we use "district court." Both terms refer to the court overseeing Puerto Rico's debt restructuring under PROMESA, which authored both orders.

explain at some length why La Liga has standing to pursue the claims now before us.

I.

To resolve this matter, we must recount the facts underlying the proceeding directly at issue on appeal and those of the prior Law 29 litigation. Because we are reviewing a decision granting motions to dismiss, we "accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences therefrom in the pleader's favor." Lee v. Conagra Brands, Inc., 958 F.3d 70, 74 (1st Cir. 2020) (quoting Lanza v. Fin. Indus. Regul. Auth., 953 F.3d 159, 162 (1st Cir. 2020)).

**A. The Law 29 Litigation**

**1. PROMESA**

In 2016, Congress enacted the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), Pub. L. No. 114-187, 130 Stat. 549 (2016) (codified at 48 U.S.C. §§ 2101-2241). The law addressed an unprecedented "fiscal emergency" in the Commonwealth, caused by "[a] combination of severe economic decline, . . . accumulated operating deficits, lack of financial transparency, management inefficiencies, and excessive borrowing." 48 U.S.C. § 2194(m). These conditions left "the Government of Puerto Rico . . . unable to provide its citizens with effective services" and "affected the long-term economic stability of Puerto Rico by contributing to the accelerated outmigration of residents

and businesses."  Id.  In enacting PROMESA, Congress sought to "provide the Government of Puerto Rico with the resources and the tools it needs to address" this "crisis" by "provid[ing] an oversight mechanism to assist the Government of Puerto Rico in reforming its fiscal governance," with the ultimate goal of "encouraging the Government of Puerto Rico to resolve its longstanding fiscal governance issues and return to economic growth."  Id. § 2194(n).

PROMESA created the Financial Oversight and Management Board, an entity with "wide-ranging authority to oversee and direct many aspects of Puerto Rico's financial recovery efforts." Pierluisi v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 37 F.4th 746, 750 (1st Cir. 2022). The Board exercises "primarily local power[]" to "supervis[e] aspects of Puerto Rico's fiscal and budgetary policies."  Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC, 140 S. Ct. 1649, 1655, 1665 (2020).

PROMESA requires the governor of Puerto Rico, under the Board's oversight, to annually promulgate "Fiscal Plans," see 48 U.S.C. § 2141, which are "roadmaps for Puerto Rico 'to achieve fiscal responsibility and access to the capital markets,'" Méndez-Núñez v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 916 F.3d 98, 104-05 (1st Cir. 2019) (quoting 48 U.S.C. § 2141(b)(1)).  The Fiscal Plan must "provide for

- 5 -

estimates of revenues and expenditures" and "adequate funding for public pension systems," among other things, 48 U.S.C. § 2141(b)(1), and must be approved by the Board before it can take effect, see id. § 2141(c)(3).

PROMESA requires the Board to review "any law" enacted by Puerto Rico "to ensure that the enactment or enforcement of the law will not adversely affect the territorial government's compliance with the Fiscal Plan." Id. § 2144. This "multi-step, back-and-forth" review process begins with the governor submitting to the Board a certification containing a formal estimate of the law's fiscal impact and attesting to whether it complies with the Fiscal Plan. Pierluisi, 37 F.4th at 751 (analyzing 48 U.S.C. § 2144(a)(1)-(5)). The Board "may take such actions as it considers necessary, consistent with [PROMESA]," to enforce Puerto Rico's compliance with the certification requirement and the Fiscal Plan, "including preventing the enforcement or application of the law." 48 U.S.C. § 2144(a)(5). PROMESA also prohibits Puerto Rico from "enact[ing], implement[ing], or enforc[ing] any statute, resolution, policy, or rule that would impair or defeat the purposes of [PROMESA], as determined by the Oversight Board," id. § 2128(a)(2), and it prohibits the Commonwealth from "reprogramming" any budgeted funds unless the Board "certifies such reprogramming will not be inconsistent with the Fiscal Plan

and Budget," id. § 2144(c)(1)-(2). The Board may "seek judicial enforcement" of these requirements. Id. § 2124(k).

Title III of PROMESA creates a debt restructuring process "akin to municipal debt restructuring under Chapter 9 of the bankruptcy code." Fin. Oversight & Mgmt. Bd. for P.R. v. Ad Hoc Grp. of PREPA Bondholders (In re Fin. Oversight & Mgmt. Bd. for P.R.), 899 F.3d 13, 18 (1st Cir. 2018); see also 48 U.S.C. §§ 2161-2177. We refer to the district court overseeing those proceedings as the "Title III court." In 2017, the Board commenced a Title III debt adjustment proceeding on behalf of the Commonwealth and several of its instrumentalities, under which the original Law 29 litigation and the present case arose as adversary proceedings.

## 2. Transition to the "PayGo" System and Law 29

The Board approved a Fiscal Plan for the 2017 fiscal year in March 2017. See Fin. Oversight & Mgmt. Bd. for P.R. v. Vázquez Garced (In re Fin. Oversight & Mgmt. Bd. for P.R.), 616 B.R. 238, 242 (D.P.R. 2020). Among numerous reforms, the 2017 Fiscal Plan called for Puerto Rico's public employee pension system to transition to a "Pay-as-you-Go" or "PayGo" model. Later that year, Puerto Rico enacted legislation, known as "Act 106," that implemented this transition. Act 106 directed the Commonwealth to deliver all pension disbursements to Puerto Rico's retired public employees directly from its general fund as those payments came

due.  Puerto Rico's public employers -- including municipalities -- would finance those disbursements by reimbursing the Commonwealth each month for benefits payments to retirees associated with that employer.  See id. at 242-43.

The PayGo system was a key component of subsequent Fiscal Plans, including the 2019 Fiscal Plan.  See id. at 242.  However, shortly after that Plan's certification, lawmakers in Puerto Rico passed Law 29, formally titled the "Act for Reductions of the Administrative Burdens of the Municipalities."  Id.  Law 29 expressly aimed to circumvent the PayGo system as it applied to Puerto Rico's municipalities, proclaiming that it would "eliminate[] the obligation of municipalities to contribute to the Government health plan and 'Pay as you Go system.'"  Id.  Instead, it shifted those costs to the Commonwealth.

Before Ricardo Rosselló, Puerto Rico's then-Governor, signed Law 29, the Board warned him and Puerto Rico's legislative leaders that Law 29 would have a significant fiscal impact -- "approximately $311 million for FY20 and $1.7 billion over the next five fiscal years" -- and that the law did not appear to "compl[y] with the Certified Fiscal Plan, which includes municipalities' full payment of their obligations to [the Government health plan] and PayGo."  Id. (second alteration in original).  Despite these warnings, Governor Rosselló signed Law 29 on May 17, 2019, and the law took immediate effect.  Id.

- 8 -

The Governor subsequently delivered to the Board a compliance certification as required under 48 U.S.C. § 2144(a)(2). Id. at 242-43. The certification represented that Law 29 "[was] not significantly inconsistent with the [2019 Fiscal Plan]." Id. at 243 (second alteration in original). The Board took issue with the certification, notifying the Governor and its legislative leaders that it determined that the Commonwealth's certificate was "deficient" because it "failed to provide the formal estimate of the fiscal impact that [Law 29] will have." Id. (alteration in original). The Board directed the Commonwealth to submit a corrected certificate, but the Commonwealth ignored that request. See id.

### 3. Law 29 Litigation and the Order and Opinion

In July 2019, the Board commenced an adversary proceeding claiming that Law 29 was not properly certified, inconsistent with the 2019 Fiscal Plan, and impaired and defeated the purposes of PROMESA, thus making it invalid. See id. at 240-41. The complaint named Puerto Rico's governor and the Fiscal Agency and Financial Advisory Authority ("AAFAF," for its Spanish acronym) as defendants.[2] The Board sought a declaration that Law

---

[2] The city of San Juan and two organizations representing the mayors of multiple municipalities sought to intervene. The district court denied those motions, finding the interests of the municipalities adequately represented by the Governor. See Order on Mots. to Intervene at 2, In re Fin. Oversight & Mgmt. Bd. for P.R., Title III Case No. 17-BK-3283, Adv. Proc. No. 19-393-LTS

29 was a nullity and of no effect. Id. at 241, 244. The Board also sought a permanent injunction barring the enforcement of Law 29. Id. at 244.

The Title III court issued its O&O on April 15, 2020, granting the Board summary judgment on all relevant counts.[3] Id. at 241. Specifically, the court held that the Governor had failed to properly certify Law 29. Id. at 247-48. Accordingly, the court "deemed [Law 29] a nullity." Id. at 248. The court further held that Law 29 was "unenforceable and of no effect," because the Board had determined that the law impaired or defeated the purposes of PROMESA. Id. at 250. Based on these conclusions, the court issued a permanent injunction against "implementing and enforcing" Law 29. Id. At the defendants' request, the court stayed the effective date of its O&O through May 6, 2020 to allow time for the Board and the Commonwealth to negotiate a process through which

---

(D.P.R. July 23, 2019), ECF No. 35; Order on Mot. to Intervene at 3, In re Fin. Oversight & Mgmt. Bd. for P.R., Title III Case No. 17-BK-3283, Adv. Proc. No. 19-393-LTS (D.P.R. Sep. 4, 2019), ECF No. 70. These rulings were not appealed.

[3] The Title III court denied summary judgment on three counts. One count asked the court to declare Law 29 a nullity and enjoin its enforcement under separate provisions of PROMESA. Finding that relief duplicative, the court declined to award summary judgment on that count. See Vázquez Garced, 616 B.R. at 256 n.11. The remaining counts sought prospective relief related to the Commonwealth's submission of compliance certificates for Law 29 and in general. See id. at 250, 255-56.

the municipalities would meet their PayGo obligations.  Id. at 257.  The O&O was never appealed.

**B. The present case**

### 1. Factual Background

Puerto Rico applied Law 29 for nearly a year, from its enactment in May 2019 until the O&O took effect in May of 2020 (the "challenged period").  During this time, the municipalities did not pay the PayGo fees required under Act 106, nor did they make contributions to their employees' health care plans.  The Board estimated that the municipalities retained $197.3 million under the auspices of Law 29.

The Board took the position that the O&O had declared Law 29 null and void from its inception, and it therefore concluded that the municipalities needed to repay to the Commonwealth the funds they owed for the challenged period.  To recoup that debt, the Board reached an agreement with Puerto Rico's government whereby the Centro de Recaudacion de Ingresos Municipales ("CRIM"), which collects property taxes for the municipalities, would divert to the Commonwealth certain disbursements that would otherwise have gone to the municipalities.  The recovery of the municipalities' debts has been incorporated into each subsequent Fiscal Plan.  The complaint states that this arrangement has

deprived the municipalities of "not less than Three Hundred Forty Million Dollars ($340,000.00)."[4]

Plaintiff-appellant La Liga is a not-for-profit, non-partisan membership organization. Its formal membership consists of the democratically-elected mayors of Puerto Rico municipalities. The purpose of La Liga is to advocate for the interests of the municipalities its member-mayors were elected to represent. La Liga concedes that the municipalities cannot rely on Law 29 to excuse PayGo or benefit obligations arising after the O&O's effective date. However, La Liga disputes that the O&O nullified Law 29 retroactively to cover the challenged period. It therefore protests the Board's efforts to recover the funds the Commonwealth paid during that time to cover the municipal obligations.

### 2. Procedural Background

Asserting organizational standing to bring this adversary proceeding, La Liga's complaint named as defendants (1) the Board, (2) CRIM, and (3) various Puerto Rico executive branch entities and officials, including AAFAF, a fiscal agent and advisor for the municipalities; the Administración de Seguros de

---

[4] We note the significant discrepancy between the two figures stated in the complaint. The record does not clarify the precise value of the alleged loss, but, as mentioned, the Board estimated that the municipalities had retained $197.3 million under Law 29, giving some sense of the scale of the dispute. Ultimately, the exact figure is immaterial to the issues on appeal.

Salud de Puerto Rico ("ASES"), the public corporation that manages Puerto Rico's public health insurance system; and the administrator of Puerto Rico's Employee Retirement System ("ERS").[5]

In its complaint, La Liga alleged that the O&O nullified Law 29 only as of the order's effective date, and thus the back payments orchestrated by the Board were improper. La Liga argued that nothing in the O&O expressly invalidated Law 29 retroactively to cover the challenged period. Moreover, La Liga asserted that the Title III court lacked the authority to enter such an order, and thus the O&O should not be read to do so. Accordingly, La Liga requested a declaration that the municipalities' purported debt does not exist and that the withholdings offsetting that debt were unlawful. In addition, La Liga sought an injunction prohibiting appellees from diverting any more funds from the municipalities as back payments and ordering them to return funds wrongly diverted.

Appellees moved to dismiss. The executive branch defendants filed a motion under Federal Rule of Civil Procedure 12(b)(1) asserting that La Liga lacked standing to bring the action against them. The Board and CRIM each filed a motion under Rule 12(b)(6), arguing that La Liga had failed to state a claim for

---

[5] We call these defendants the "executive branch defendants."

relief because the O&O by its terms applied to the challenged period.[6]

The district court granted all three motions to dismiss. Citing Supreme Court precedent, it held that La Liga lacked constitutional standing to sue the executive branch defendants, as the municipalities' injury was neither traceable to their conduct nor redressable by them. See Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992). The district court granted the Board and CRIM's motions to dismiss on the merits. It held that the O&O -- which the district court had itself authored -- did apply to the challenged period when it declared Law 29 a "nullity" and "of no effect."

La Liga timely appealed, arguing that the district court erred both in finding that La Liga lacked standing to sue the executive branch defendants and in granting the motion to dismiss on the merits as to CRIM and the Board.

**II.**

We begin by addressing La Liga's standing. The arguments against La Liga's constitutional standing have accumulated over time. In the district court, only the executive branch defendants

_____

[6] Although the Board also moved to dismiss for lack of standing on statutory grounds, the district court concluded that there was "a clearer basis" for dismissing the action against the Board on the merits. The district court therefore did not opine on La Liga's standing with respect to the Board, and the Board has not renewed this statutory standing argument on appeal.

- 14 -

challenged La Liga's constitutional standing, and only as to its ability to sue them. In its appellate briefing, CRIM newly argued that La Liga lacked standing to sue it as well. At oral argument, the panel questioned for the first time whether La Liga had standing to sue at all. Our dissenting colleague argues that La Liga does not. Because we have an independent obligation to assure ourselves of our jurisdiction, see Ryan v. U.S. Immigr. & Customs Enf't, 974 F.3d 9, 17 n.4 (1st Cir. 2020), these belated and never-pressed standing arguments are properly before us.

## A. Standard of Review

Our analysis of La Liga's standing is de novo. See Me. People's All. & Nat. Res. Def. Council v. Mallinckrodt, Inc., 471 F.3d 277, 284 (1st Cir. 2006). At the pleading stage, we "apply [to questions of standing] the same plausibility standard used to evaluate a motion under Rule 12(b)(6)." Gustavsen v. Alcon Lab'ys, Inc., 903 F.3d 1, 7 (1st Cir. 2018). Thus, to assess La Liga's standing, we must "accept as true all well-pleaded factual averments in [its] . . . complaint and indulge all reasonable inferences therefrom" (quoting Katz v. Pershing, LLC, 672 F.3d 64, 70 (1st Cir. 2012)). Accordingly, La Liga "need not definitively prove [its] injury or disprove [appellees'] defenses" but need only "plausibly plead on the face of [its] complaint" facts supporting standing. Tyler v. Hennepin Cnty., 598 U.S. 631, 637 (2023) (citing Lujan, 504 U.S. at 561).

- 15 -

**B. Organizational Standing**

Article III of the U.S. Constitution authorizes federal courts to adjudicate only "Cases" and "Controversies," and "standing is an essential and unchanging part of the case-or-controversy requirement." Lujan, 504 U.S. at 560. To establish standing, a complaint must demonstrate three elements: (1) the plaintiff suffered an "injury in fact"; (2) the defendant caused the injury, meaning it is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party"; and (3) it is "likely . . . that the injury will be 'redressed by a favorable decision.'" Id. at 560-61 (cleaned up) (quoting Simon v. E. Ky. Welfare Rts. Org., 426 U.S. 26, 38, 41-42, 43 (1976)).

### 1. La Liga's Assertion of Organizational Standing

La Liga claims to have organizational standing,[7] which allows an organization that has not suffered an injury in fact to sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires

---

[7] Courts often refer to this concept of standing as "associational standing." See generally, e.g., United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc., 517 U.S. 544 (1996). Following La Liga's lead, we use the phrase "organizational standing" in this opinion.

the participation of individual members in the lawsuit."[8]  <u>Hunt</u> v.

<u>Wash. State Apple Advert. Comm'n</u>, 432 U.S. 333, 343 (1977).

La Liga alleges that Puerto Rico's municipalities have been deprived of significant revenue to which they were entitled. Such an "out-of-pocket loss" is "a quintessential injury in fact." <u>Wiener</u> v. <u>MIB Grp., Inc.</u>, 86 F.4th 76, 86 (1st Cir. 2023).  While La Liga has thus clearly alleged that the municipalities have suffered an Article III injury, it must also show that it is a proper party to sue on their behalf, according to organizational standing principles.

In support of its effort to sue on the municipalities' behalf, La Liga alleges that it is a "not-for-profit and nonpartisan corporation . . . whose members are Mayors of Municipalities of Puerto Rico from diverse ideological persuasions."  It further alleges that

> La Liga's vision is "to unite local governments in a nonpartisan effort to improve the quality of life of the Puerto Rican people."  Its mission is to "strengthen the capacity of local governments and communities in order to better face . . . various social, structural, fiscal and governance challenges." Consistent with that vision and mission, La Liga develops and implements various initiatives, tempered to the needs and realities of municipal governments and their communities.  The most recent initiative developed and adopted by La Liga is to defend the decimated municipal finances from the

---

[8] Only the first requirement is in dispute.

onslaught of austere measures imposed by the Oversight Board.

Thus, La Liga explains that it "has organizational standing to bring this action since the strengthening of municipal finances is germane to La Liga's mission and purpose, the Municipalities that are headed by La Liga's members have suffered substantial economic loses . . . and the participation of the individual La Liga members is not necessary." See Hunt 432 U.S. at 343.

As the dissent sees it, La Liga has a standing problem because its formal members are not the municipalities but their democratically-elected mayors. And because La Liga has not alleged that its member-mayors are legally authorized to represent the municipalities in court, the argument goes, "the record does not suggest that any member-mayor's standing to bring this suit could rest on an injury to that mayor's municipality." See, e.g., City of Bos. Delegation v. FERC, 897 F.3d 241, 248-50 (D.C. Cir. 2018) (holding that a mayor lacked standing to litigate based on injury to his city because he lacked legal authority to do so). Thus, the complaint does not meet the first Hunt requirement that La Liga's members "have standing to sue in their own right." 432 U.S. at 343.

Our dissenting colleague's doubt about La Liga's standing to sue on behalf of non-member municipalities is unfounded. Indeed, whether La Liga's member-mayors possess

standing in their own right, via the legal authority to sue on their municipalities' behalf, is simply not relevant to our standing inquiry. That is because, as we will explain in more detail below, the municipalities represented by La Liga's member-mayors have sufficient "indicia of membership" in La Liga to make them functionally akin to members in the organization themselves. See id. at 344. Since it is beyond dispute that the municipalities would themselves have Article III standing to bring the present lawsuit, and the remaining requirements of organizational standing are also satisfied, La Liga has organizational standing to sue on behalf of municipalities that are, "for all practical purposes," the equivalent of its formal members. Id.

### 2. The "Indicia of Membership" Test

In Hunt, the Supreme Court introduced the so-called "indicia of membership" test to explain why the plaintiff in that case had organizational standing to sue on behalf of non-members, just as La Liga seeks to do here. See id. at 343-45. The plaintiff in Hunt was a state commission composed of commissioners who were elected by, drawn from, and represented the interests of apple growers and sellers in Washington state who were injured by a North Carolina statute that would have burdened the Washington apple industry in its efforts to ship apples into North Carolina. The Washington State Apple Advertising Commission brought suit to enjoin this law on behalf of its constituency of apple growers and

dealers, even though they were not "members" of the organization in any formal sense (indeed, it had no members).

The Court explained that the Commission "for all practical purposes" "represent[ed] the Washington apple industry" because "its purpose [was] the protection and promotion of the Washington apple industry," which was the "primary beneficiary of its activities, including the prosecution of this kind of litigation." Hunt, 432 U.S. at 344. "Moreover, while the apple growers and dealers [were] not 'members' of the Commission," formally speaking, "they possess[ed] all of the indicia of membership." Id. (emphasis added). For instance, "they alone elect[ed] the members of the Commission; they alone [could] serve on the Commission;" and they financed the Commission. Id. "In a very real sense, therefore, the Commission represent[ed] the State's growers and dealers and provide[d] the means by which they express[ed] their collective views and protect[ed] their collective interests." Id. at 345. Cautioning against "exalt[ing] form over substance," the Court found standing easily proven in support of the Commission's effort to sue on behalf of non-members. Id.

In Students for Fair Admissions, Inc. v. President & Fellows of Harvard College ("SFA"), though we ultimately did not apply the "indicia of membership test, we recognized that an organization may sometimes sue on behalf of non-members, and we

repeated from <u>Hunt</u> five features to consider in applying the "indicia of membership" test, including: "whether the organization's purpose is to protect and promote the interests of its non-members, whether these non-members are 'the primary beneficiar[ies] of its activities,' and whether non-members elect its members, are the only people who may be members, or finance the organizations' activities."  980 F.3d 157, 183 (1st Cir. 2020) (alteration in original) (quoting <u>Hunt</u>, 432 U.S. at 344-45), <u>rev'd on other grounds</u>, 600 U.S. 181 (2023).  Moreover, we note here that courts applying the "indicia of membership" test have been clear that the criteria discussed in <u>Hunt</u> are illustrative, not exhaustive.  <u>See</u>, <u>e.g.</u>, <u>Flyers Rts. Educ. Fund, Inc.</u> v. <u>U.S. Dep't of Transp.</u>, 957 F.3d 1359, 1362 (D.C. Cir. 2020); <u>Or. Advoc. Ctr.</u> v. <u>Mink</u>, 322 F.3d 1101, 1111 (9th Cir. 2003); <u>Doe</u> v. <u>Stincer</u>, 175 F.3d 879, 886 (11th Cir. 1999).

In <u>Mink</u>, for example, the constituents of the plaintiff organization lacked many of the "indicia of membership" discussed in <u>Hunt</u>.[9]  <u>See</u> 322 F.3d at 1111.  Indeed, the constituents did not

---

[9] The organization in <u>Mink</u> was a nonprofit legal advocacy organization that represented the rights of people with disabilities, including people with mental illness.  322 F.3d at 1105.  It sought to sue on behalf of one of its constituents, a mentally incapacitated criminal defendant who was detained in county jail while awaiting transfer to a hospital.  <u>Id.</u> Established pursuant to the Protection and Advocacy for Mentally Ill Individuals Act of 1986, 42 U.S.C. §§ 10801-1085, the organization was federally funded and, as required by statute, had a governing board and advisory counsel that included members of

fund the organization or solely elect its leaders, who were not limited to that constituency. Id. Nonetheless, the court found that the "indicia of membership" test had been satisfied, concluding that what "undergird[s]" the analysis is whether "the organization is sufficiently identified with and subject to the influence of those it seeks to represent as to have a 'personal stake in the outcome of the controversy'" and noting that its constituency had means to direct and influence the organization's activity. Id. (quoting Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 261 (1977)). Other courts have described the substance-over-form purpose of this "functional analysis" in similar terms. See Friends of the Earth, Inc. v. Chevron Chem. Co., 129 F.3d 826, 828 (5th Cir. 1997) (holding that the purpose of the "indicia of membership" test is to determine whether the "nature of the relationship between the [organization] and the relevant interests of [its non-members] satisfie[s] the goals of the constitutional standing requirement"); Doe, 175 F.3d 886 (holding that the "indicia of membership" test is satisfied when an organization's constituents "possess the means to influence the priorities and activities the [organization] undertakes"); Flyers Rts. Educ. Fund, 957 F.3d at 1362 (holding that the "indicia of

---

the constituency or their family members, as well as a grievance procedure through which it was accountable to its constituents. Id. at 1111-12.

- 22 -

membership test" is satisfied where non-member constituents have "a sufficient amount of interaction" with the organization "to influence [its] activities").

### 3. Applicability of the "Indicia of Membership" Test

Before we explain why La Liga's allegations plausibly satisfy the "indicia of membership" test, we must address the dissent's argument that this test is not applicable in the present case. The dissent bases that assertion on the fact that La Liga takes the form of a voluntary membership association. To defend that claim, the dissent relies on an out-of-context reading of our discussion of the "indicia of membership" test in SFA, 980 F.3d at 183-84. There, we observed that the test applies to "organizations that are not voluntary membership organizations." Id. at 183. SFA involved a voluntary membership association suing on behalf of its official members: students who had been denied admission to Harvard. Even though the organization was thus clearly suing on behalf of members who would have had standing in their own right, see Hunt 432 U.S. at 434, Harvard argued that, nonetheless, the association needed to further show that those members also bore the "indicia of membership," see SFA, 980 F.3d at 183; see also Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 261 F. Supp. 3d 99, 106-09 (D. Mass. 2017) (further elucidating Harvard's standing argument, which would have required the application of the "indicia of membership test" whenever

- 23 -

membership organizations sue on behalf of their members to probe "whether [their] 'members' are 'genuine' members or not, with the organization's view of its own members being only one factor in the analysis"), aff'd, 980 F.3d 157, rev'd, 600 U.S. 181.

With the language quoted by the dissent, we rejected Harvard's assertion that the "indicia of membership" test "must be met" in cases where a traditional membership organization is seeking "on [its] face" to litigate on behalf of its own members. SFA, 980 F.3d at 184. Rather, we agreed that the analysis is only relevant in "situations in which an organization is attempting to bring suit on behalf of individuals who are not members." Id. at 184 n.21 (quoting Cal. Sportfishing Prot. All. v. Diablo Grande, Inc., 209 F. Supp. 2d 1059, 1066 (E.D. Cal. 2002)).

In other words, we held in SFA only that the "indicia of membership" test is not relevant when a voluntary membership organization aims to sue on behalf of its members. We did not consider the present question of whether a voluntary membership organization can sue on behalf of non-members who nonetheless have the requisite "indicia of membership." Our common sense holding in SFA aligns with the purpose of the "indicia of membership" test, which is to determine whether, practically speaking, an organization has the appropriate relationship with non-members to sue on their behalf. See Friends of the Earth, 129 F.3d at 828. No such inquiry is necessary when an organization represents its

formal members in court. It obviously can. Here, however, La Liga seeks to sue on behalf of non-members. Thus, taken in context, the language from SFA upon which the dissent relies says nothing about the applicability of the "indicia of membership" test in the present circumstance.

The dissent's argument that the "indicia of membership" test is unavailable to La Liga, purely because it takes the form of a voluntary membership organization, is incompatible with Hunt's admonition not to "exalt form over substance." 432 U.S. at 345. While the dissent argues that this "pithy phrase" means nothing more than that we should not "treat entities that are functionally traditional trade associations differently for purposes of standing from entities that formally are," the text of the decision speaks of no such limitation.[10] To the contrary,

---

[10] The dissent also points to a subsequent case in which the Supreme Court resoundingly reaffirmed the standing principles announced in Hunt, clarifying that even though associations may "not always be able to represent adequately the interests of all their injured members," that possibility did not "persuad[e] [the Court] to abandon settled principles of associational standing." Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock, 477 U.S. 274, 290 (1986). The opinion -- which does not discuss the "indicia of membership" test in particular -- does not suggest that the possibility of inadequate representation presents an Article III concern, but merely explains that, under due process principles, individual members of an association may not, in some cases, be precluded from separately raising their individual claims. Id. Nothing in Brock's explanation of why an association's members "band together," drawing upon shared expertise and resources to collectively vindicate their interests, applies with any less force to an organization's ability to adequately represent those who are, under the "indicia of

courts have rejected the dissent's rigid formalism.  In Friends of the Earth, for example, over a dissent arguing that Hunt should not be extended from its original context of a state agency to cover nonprofit organizations, the Fifth Circuit stated that there is "no cogent reason to limit [the 'indicia of membership'] test to the facts of Hunt," adding that such "formalistic argument[s]" "lack[] merit" in the context of applying the "indicia of membership" test.  129 F.3d at 828-29 (quoting Pub. Int. Rsch. Grp. of N.J., Inc. v. Magnesium Elektron, Inc., 123 F.3d 111, 119 (3d Cir. 1997)).

Moreover, contrary to the suggestion of the dissent, there is nothing novel about applying the "indicia of membership" test to voluntary membership organizations suing on behalf of non-members.  Indeed, it appears to be the universal practice of federal courts to apply the "indicia of membership" test in this circumstance.[11]  In Nestle Ice Cream Co. v. N.L.R.B., 46 F.3d 578,

---

membership test," the functional equivalent of its members, even if not included in its formal membership rolls.

[11] The dissent's only citation to the contrary is a concurring opinion in an out-of-circuit case that never mentions the "indicia of membership" test but merely observes that a nonprofit organization may not premise its assertion of standing on "the interests of nonmembers for whose interests [the organization] advocates." Ne. Ohio Coal. for the Homeless v. Blackwell, 467 F.3d 999, 1013 (6th Cir. 2006) (McKeague, J., concurring) (emphasis omitted); see also id. at 1010 n.4 (the majority agreeing with this assertion).  We agree that La Liga could not premise its standing on only the fact that it advocates for municipalities. Rather, the "indicia of membership" test considers the ability of those municipalities to influence the organization in order to

586 (6th Cir. 1995), for instance, the Sixth Circuit applied the "indicia of membership" test to assess whether a union had standing to sue on behalf of nonunion employees. Likewise, the Seventh Circuit applied the "indicia of membership" test in Hope, Inc. v. DuPage County, 738 F.2d 797, 814-15 (7th Cir. 1984), to determine whether a nonprofit organization had standing to sue on behalf of non-member constituents, as distinct from its "members and directors."[12] Similarly, in numerous cases, district courts have applied the "indicia of membership" test to determine whether a voluntary membership organization had standing to sue on behalf of non-members, in several instances finding the test satisfied.[13]

---

assure ourselves that the municipalities are the functional equivalents of members in the organization. See Section II.B.4, infra.

[12] Another example from the circuit courts is Interfaith Community Organization v. Honeywell International, Inc., 399 F.3d 248 (3d Cir. 2005). In that case, the Third Circuit agreed with the district court that an interfaith organization had organizational standing and expressly upheld the district court's findings regarding membership. Id. at 258. The district court, in turn, had found that the organization had standing to sue on behalf of both "members of [the organization] or individuals with sufficient indicia of membership to be treated as members." Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 188 F. Supp. 2d 486, 499 (D.N.J. 2002). Thus, while the Third Circuit did not expressly apply the "indicia of membership" test, its embrace of the district court's standing analysis, along with its acknowledged "obligation to examine our own jurisdiction and that of the district courts," Interfaith Cmty. Org., 399 F.3d at 254, strongly suggests that the circuit court approved of the application of the "indicia of membership" test in that context.

[13] See, e.g., Sec. Indus. & Fin. Mkts. Ass'n v. U.S. Commodity Futures Trading Comm'n, 67 F. Supp. 3d 373, 409-11 (D.D.C. 2014) (holding that association had standing to sue on behalf of

On the other hand, we are aware of no case holding the "indicia of membership" inapplicable because the plaintiff was a voluntary membership organization. The only federal court to opine on the argument that the "indicia of membership" test should be inapplicable to membership organizations suing on behalf of non-members found that contention, as we do, meritless. See Sec. Indus. & Fin. Mkts. Ass'n v. United States Commodity Futures Trading Comm'n, 67 F. Supp. 3d 373, 410 (D.D.C. 2014) (stating that it could "divine no reason why the ['indicia of membership'] test should not also apply to traditional trade associations that purport to represent, in addition to their formal members, the interests of informal members as well"). Stressing that such an

"functional member" not included in "formal membership rolls"); Interfaith Cmty. Org., 188 F. Supp. 2d at 499 (finding voluntary membership organization had standing to sue on behalf of both "members of [the organization] or [non-member] individuals with sufficient indicia of membership to be treated as members" (emphasis added)); City of Philadelphia v. Beretta U.S.A., Corp., 126 F. Supp. 2d 882, 896 n.10 (E.D. Pa. 2000) (concluding that "[n]on-members" "served by the [plaintiff membership organizations] [possessed] sufficient indicia of membership," but that the organizations lacked standing on other grounds), aff'd, 277 F.3d 415 (3d Cir. 2002). See also Am.'s Frontline Drs. v. Wilcox, No. 21-1243, 2022 WL 1514038, at *7 (C.D. Cal. May 5, 2022); Waskul v. Washtenaw Cnty. Cmty. Mental Health, 221 F. Supp. 3d 913, 918 (E.D. Mich. 2016), aff'd, 900 F.3d 250 (6th Cir. 2018); Conservative Baptist Ass'n of Am., Inc. v. Shinseki, 42 F. Supp. 3d 125, 133 (D.D.C. 2014); United States v. City of New York, No. 07-2067, 2011 WL 2259640, at *9 (E.D.N.Y. June 6, 2011); Int'l Bhd. of Elec. Workers AFL-CIO v. Citizens Telecomms. Co. of Cal., No. 06-0677, 2006 WL 1377102, at *3 (E.D. Cal. May 18, 2006), aff'd, 549 F.3d 781 (9th Cir. 2008); NAACP v. Harris, 567 F. Supp. 637, 640 (D. Mass. 1983).

approach would "formalistically" "deny plaintiffs the advantages of the 'indicia of membership' test," the court there held that an entity that did not appear on a trade association's "limited, formal membership rolls" nonetheless was "a functional member of [the trade association] for purposes of the associational standing analysis." Id. at 410-11.

Finding a voluntary membership organization to have standing to sue on behalf of non-members is not even novel in our court. In Railway Labor Executives' Association ("RLEA") v. Boston & Maine Corp., we expressly held just that, citing Hunt as support. See 808 F.2d 150, 153 n.8 (1st Cir. 1986). The plaintiff in that case was, as the district court put it, "a voluntary, unincorporated association of the Chief Executive Officers of nineteen standard labor organizations," who brought suit to "protect[] the rights of the membership of the unions," not the rights of the executives. 639 F. Supp. 1092, 1095-96 (D. Me. 1986) (emphasis added); see also RLEA, 808 F.2d at 153 (explaining that the association aimed "to prevent [the defendants] from taking discriminatory action against the striking employees" or "retaliating against the employees who refused to cross . . . picket lines"). We were thus aware that the plaintiff in that case did not premise its standing on an injury suffered by its formal membership. Instead, as here, the injury was suffered

by a separate constituency of non-members. Nonetheless, the organization had standing to sue on behalf of the non-members.

We do not agree with the dissent that RLEA has nothing to teach us about the applicability of the "indicia of membership" test in this case. True, when a court simply exercises jurisdiction in a prior similar case, with no explanation, it does not create precedent regarding jurisdiction. See Lewis v. Casey, 518 U.S. 343, 352 n.2 (1996); Fed. Election Comm'n v. NRA Pol. Victory Fund, 513 U.S. 88, 97 (1994). In RLEA, however, we made an express finding about standing, which we explained by citing generally to Hunt. We can properly glean, at least, that Hunt explained why the membership organization in that case had standing to sue on behalf of non-members, a conclusion that only the "indicia of membership" test discussed in Hunt could support.

Mindful of the substance-over-form underpinnings of the "indicia of membership" test, and in accordance with the universal practice of federal courts in similar circumstances, the "indicia of membership" test is clearly applicable to determine whether La Liga has standing to sue on behalf of the non-member municipalities.

As for the dissent's argument that La Liga never invoked the "indicia of membership" test, that complaint rings hollow. As we have detailed, there were no questions about La Liga's organizational standing throughout this litigation until the panel

raised them briefly at oral argument.  While we have an independent obligation to confirm our jurisdiction, we must, by the same token, test for ourselves the allegations in La Liga's complaint against well-settled standing principles.  See, e.g., Hartig Drug Co. v. Senju Pharm. Co., 836 F.3d 261, 267 (3d Cir. 2016) (explaining that while "[a] court's non-waivable obligation to inquire into its own jurisdiction is most frequently exercised in the negative," courts "have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not," and thus it was appropriate to consider arguments favoring standing not presented by the appellant (quoting Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716 (1996))).[14]  More importantly, contrary to the dissent's assertion that La Liga has waived standing arguments it never had an occasion to fully flesh out, we are taking no great leap from what La Liga has asserted all along: that it possesses organizational standing to sue on behalf of non-member

_____

[14] Contrary to the dissent's description, in Hartig, the Third Circuit concluded that it had jurisdiction on a basis that the appellant had not argued.  See 836 F.3d at 267.  Indeed, whereas the court concluded that it had jurisdiction because the standing question at issue was not an Article III issue, the appellant had conceded that it was.  Id.  Here, by contrast, La Liga has consistently argued that it has organizational standing.  As we explain below, we agree that its complaint plausibly supports exactly that contention.  Accordingly, Guaranty National Title Co. v. J.E.G. Associates, 101 F.3d 57 (7th Cir. 1996), in which the court simply found that the plaintiff's complaint and supplemental filings were "shockingly" sparse on the relevant jurisdictional question, id. at 58, does not counsel a different result.

municipalities represented by its member-mayors.  We need only apply a seminal case on organizational standing to understand why that approach is sound.  See Hunt, 432 U.S. at 343-45.  For these reasons, our analysis does not run afoul of the general principle that we should "rely on the parties to frame the issues for decision."  Greenlaw v. United States, 554 U.S. 237, 243 (2008).

### 4. Applying the "Indicia of Membership" test

Satisfied that the "indicia of membership" test is appropriate to apply in the present case, we must now determine whether La Liga is "sufficiently identified with and subject to the influence of [the municipalities] it seeks to represent," Mink, 322 F.3d at 1111, so as to provide "the means by which they express their collective views and protect their collective interests," Hunt, 432 U.S. at 345.

To begin, we note that La Liga's allegations, quoted above in full, describe it to be such a spokesperson for the municipalities "headed by" its member-mayors.  It alleges that its purpose is to "unite local governments" and thereby "strengthen the[ir] capacity" to meet "governance challenges," including, as most relevant here, by "defend[ing] the decimated municipal finances from the onslaught of austere measures imposed by the Oversight Board."  Moreover, its initiatives are "tempered to the needs and realities of municipal governments," suggesting that the municipalities influence the organization's activity, including

- 32 -

the present effort. To be sure, its formal membership consists of the mayors of those municipalities, not the municipalities themselves. Our task, therefore, is to determine whether it is plausible that an association of mayors could be functioning as a representative of those mayors' municipalities.

Starting with the "indicia of membership" discussed in Hunt, La Liga's purpose is plainly to advocate for the interests of the municipalities its member-mayors represent, making these municipalities the "primary [and sole] beneficiar[ies] of its activities," including this litigation. 432 U.S. at 344. Moreover, La Liga's membership is elected exclusively by these municipalities. Indeed, it is reasonably clear that these municipalities are La Liga's only constituents, as it appears that only the currently elected mayors of Puerto Rico's municipalities may be members, and there is no suggestion that La Liga serves the interests of anyone other than the municipalities, not even those of its member-mayors. While La Liga's complaint does not clarify the source of its funding, the absence of this one indicum is not outcome-determinative. See, e.g., Flyers Rts. Educ. Fund, 957 F.3d at 1362; Mink, 322 F.3d at 1111; Doe, 175 F.3d at 886.

It is also evident from the "nature of the relationship between [La Liga] and the relevant interests of [the municipalities]," Friends of the Earth, 129 F.3d at 828, that La Liga "is sufficiently identified with and subject to the influence

- 33 -

of" the municipalities such that the municipalities are the "functional equivalent" of members, Mink, 322 F.3d at 1111-12. On this score, we find it highly relevant that La Liga's formal membership appears to consist solely of democratically-elected mayors who (we can reasonably infer) participate in the organization in that capacity, and expressly on their municipalities' behalf. Considering the institutional, political, and legal mechanisms of accountability inherent in the relationship between a mayor and municipality, and aided by our "judicial experience and common sense," Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009), we think that La Liga's complaint plausibly establishes that the municipalities have considerable influence over La Liga's member-mayors, and, thus, La Liga itself.

We also note that finding the "indicia of membership" test satisfied here aligns with our holding in RLEA. See 808 F.2d at 153 n.8. While we do not know the RLEA court's exact reasoning, the facts known to the panel in that case -- in which an association of elected labor executives had standing to sue on behalf of the non-member union workers they represented -- are closely analogous to those known to the court in the present case -- in which an association of elected mayors seeks to sue on behalf of the municipalities they represent. RLEA thus provides

additional support for La Liga's standing under comparable circumstances.[15]

In short, La Liga has adequately alleged that the municipalities are "for all practical purposes" represented by La Liga as if they were themselves its members. Hunt, 432 U.S. at 344. After all, La Liga exists to represent the interests of these municipalities, its formal members are elected by the municipalities, and the municipalities -- its sole constituents -- are well-positioned to direct and influence the organization. "In a very real sense, therefore, [La Liga] represents the [municipalities] and provides the means by which they express their collective views and protect their collective interests." Hunt 432 U.S. at 345.

---

[15] The dissent's effort to distinguish the facts of RLEA is unpersuasive. Indeed, the only authority referenced by the dissent to distinguish RLEA is briefing by the same association in a different case years later, which, of course, reveals nothing about our thinking in RLEA. See Brief of Movant-Intervenor RLEA at 1-6, Am. Train Dispatchers Ass'n v. I.C.C., 26 F.3d 1157 (D.C. Cir. 1994) (No. 92-1397), 1993 WL 13650707, at *1-6. And the conclusions the dissent draws from that briefing are no more convincing. The dissent argues that the briefing shows that the organization's "board was at least controlled by [its members]," which is reason to think that the "injured parties there . . . were positioned to exercise control . . . over the members of the organization who themselves controlled its decisions." But the cited briefing says nothing about the organization's board. Moreover, as explained, La Liga is plausibly subject to the control of the municipalities in much the same way as the dissent posits the organization in RLEA was subject to the control of the non-member union employees on whose behalf it sued.

- 35 -

The dissent raises several additional objections, all of which, at their root, take issue with our common sense conclusion that La Liga is plausibly subject to the influence of the municipalities sufficiently to satisfy the "indicia of membership" test. In the dissent's view, La Liga's effort to sue on the municipalities' behalf "risks undermining the ability of governments at all levels of our democratic system to determine who will represent them in federal court." For the reasons described above, these concerns for the preservation of democratic control are simply not credible.[16] Nor are they supported by any of the discrete arguments the dissent raises.

---

[16] In City of Chicago v. Sessions, 2017 WL 5499167, at *5 (N.D. Ill. Nov. 16, 2017), the district court rejected a similar argument that the United States Conference of Mayors lacked standing to sue on behalf of its member cities, noting that there is "no authority for the proposition that litigation must be specifically authorized by members" to establish standing. Moreover, we note that this case is just one of many cases in which federal courts have found that municipal associations have standing to sue on behalf of municipalities or have exercised jurisdiction over such cases. See Iowa League of Cities v. E.P.A., 711 F.3d 844 (8th Cir. 2013); Tex. Coal. of Cities for Util. Issues v. F.C.C., 324 F.3d 802 (5th Cir. 2003); City of Evanston v. Barr, 412 F. Supp. 3d 873 (N.D. Ill. 2019); cf. Nat'l League of Cities v. Usery, 426 U.S. 833 (1976); City of Portland v. United States, 969 F.3d 1020 (9th Cir. 2020); N.C. Comm'n of Indian Affs. v. U.S. Dep't of Lab., 725 F.2d 238 (4th Cir. 1984). While not all of these cases bear directly on La Liga's standing, they further show that La Liga's effort to litigate on behalf of municipalities -- as similar organizations have done many times previously -- is nothing out of the ordinary, nor, certainly, the threat to democratic control that the dissent suggests.

First, the dissent argues that the election of La Liga's member-mayors is not a compelling "indicum of membership" because "La Liga's members were elected to their mayoral offices. They were not elected to La Liga." In a similar vein, the dissent argues that other factors considered in Hunt are absent here. This argument fails because the precise "indicia of membership" discussed in Hunt need not be present exactly as they were in that case to find the test satisfied. In neither Mink, 322 F.3d at 1111, nor Doe, 175 F.3d at 88, did the organization's non-member constituents fund the organization, exert exclusive control over the organization, nor solely select the organization's leaders. Nonetheless, these constituents had enough "indicia of membership" to confer standing because they had other adequate means to influence their respective organizations. The same is true here. Moreover, the municipalities do solely elect La Liga's membership. True, the municipalities do not elect their mayors specifically to be members of La Liga, but they do elect them to represent the municipalities and to work in the municipalities' best interests, which is the mayors' express purpose for joining the organization.

The dissent next argues that there is no basis to conclude that "La Liga's mayors have been entrusted to unilaterally make the fraught decision to sue." But, as the dissent acknowledges, Puerto Rico law states that a core function of mayors is to "[r]epresent the municipality in juridical or extra-

- 37 -

juridical actions brought by or against the municipality, appear before any Court of Justice, forum or public agency of the Government of the Commonwealth of Puerto Rico and the Government of the United States of America, and support all kinds of rights, actions and procedures."  P.R. Laws Ann. tit. 21, § 4109(e).[17] This statute provides strong support for the proposition that La Liga's member mayors are entrusted to carry out precisely the sort of litigation now before us.[18]  In so reasoning, we do not "conclude," as the dissent accuses, that "mayors are the definitive decisionmakers as to all matters of consequence for their municipalities."  Indeed, to the contrary, our observation here

---

[17] The remainder of this subsection provides:

> The mayor may not acquiesce to, or fail to answer any suit in any procedure or action in which the municipality is a party, without the prior consent of the absolute majority of the members of the municipal legislature.  The mayor shall submit to the consideration of the municipal legislature any transaction offer that entails any type of financial disbursement over twenty five thousand dollars ($25,000), prior to submitting said transaction offer to the consideration of the juridical forum.

[18] The dissent asserts that this statute does not "obviously settle the question of mayoral authority to sue."  This argument is simply a recycled version of the dissent's underlying theory for why La Liga lacks standing.  As we explained at the outset, we do not need to "settle" whether and under what circumstances the mayors have authority to initiate litigation on their municipalities' behalf because -- if the "indicia of membership" test is satisfied -- it is the standing of the municipalities, and not the mayors, that ultimately matters.

that Puerto Rico law expressly tasks mayors with representing municipalities in court is simply meant to demonstrate that La Liga's effort in this case is consistent with the duties of its democratically accountable member-mayors and thus provides additional reason to think that La Liga is "sufficiently identified with and subject to the influence of [the municipalities] it seeks to represent." Mink, 322 F.3d at 1111.

Finally, the dissent complains that La Liga has not described "the role that any of its member-mayors plays in deciding the course of action that the organization itself may take." The dissent's concern appears to rest on an unsupported notion that La Liga's member-mayors themselves lack the means to control the organization, and thus the municipalities' obvious influence over its mayors is not enough to conclude that the municipalities influence the organization by extension. We see no basis in the record to draw the adverse inference against La Liga that its member-mayors are unable to control the organization. For one thing, the mayors appear to be La Liga's only formal members, and we can reasonably infer from this fact that they direct the organization. Moreover, La Liga's allegation that the organization's initiatives are "tempered to the needs and realities of municipal governments" supports the plausible inference that the member-mayors -- those positioned to represent their municipalities' needs and realities -- shape the

organization's agenda. Simply put, there is no suggestion that anyone other than La Liga's member-mayors, acting as representatives of their municipalities, direct the organization's activity (subject, in turn, to the direction of their municipalities).

The dissent's demand that La Liga allege all of its inner workings is thus irreconcilable with the pleading standard. See Tyler, 598 U.S. at 637 (reminding that a plaintiff "need not definitively prove" standing at the pleading stage).[19] Our reasonable inference, explained above, that the municipalities have considerable means to influence La Liga's member-mayors, and, thus, La Liga itself, is sufficient to satisfy the requirements of organizational standing on a motion to dismiss, without knowing all the ins and outs of La Liga's organizational structure. See Lujan, 504 U.S. at 561 ("At the pleading stage, general factual allegations" supporting standing "may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" (alteration in original) (quoting Lujan v. Nat'l Wildlife Fed'n,

---

[19] The dissent's citation to McBreairty v. Miller, 93 F.4th 513, 517-21 (1st Cir. 2024), does not support the contrary proposition. In that case, which involved the denial of a preliminary injunction and thus had the benefit of an evidentiary hearing to illuminate the standing inquiry, see id. at 516, 518 n.2, we simply held that the plaintiff had not alleged or adduced sufficient facts from which to infer standing. Here, however, La Liga has done so.

497 U.S. 871, 889 (1990))); see also Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y, 153 F. Supp. 3d 1291, 1313 (W.D. Wash. 2015) (denying motion to dismiss where the organization made only "minimal allegations about its financial contributions or managerial structure" but had "plead[ed] sufficient facts to allow the court to reasonably infer that 'the organization is sufficiently identified with and subject to the influence of those it seeks to represent'" (quoting Mink, 322 F.3d at 1111)); U.S. Student Ass'n Found. v. Land, No. 08-14019, 2010 WL 1131493, at *6 (E.D. Mich. Mar. 23, 2010) (similar); cf. Bldg. & Const. Trades Council of Buffalo, N.Y. & Vicinity v. Downtown Dev., Inc., 448 F.3d 138, 144-45 (2d Cir. 2006) (denying challenge to organizational standing that "might have some validity if this litigation were at the summary judgment stage," where "[d]iscovery on this issue would therefore be substantially complete, and the evidentiary adequacy of the [plaintiff's] standing allegations could be tested").[20]

---

[20] As we explain, infra, we affirm the district court's dismissal of the complaint on the merits. But the fact that this case will not proceed to a more mature stage of litigation is no reason to depart from the pleading standard governing La Liga's standing allegations. See, e.g., Clementine Co., LLC v. Adams, 74 F.4th 77, 83-84 & 83 n.1 (2d Cir. 2023) (reversing district court's dismissal of complaint for lack of standing for failure to apply the proper pleading standard but ordering dismissal on the merits).

                              *   *   *

        In sum, we hold that the injured municipalities have

sufficient "indicia of membership" in La Liga to satisfy the

requirements of organizational standing.

## C. Causation and Redressability

        Having determined that La Liga has alleged a sufficient

injury and possesses organizational standing to sue regarding that

injury, we turn now to the remaining two elements of standing:

causation and redressability.  To establish causation, "the

plaintiff [must] show a sufficiently direct causal connection

between the challenged action and the identified harm." Katz, 672

F.3d at 71.  That connection may not be "overly attenuated,"

however, id. at 71 (quoting Donahue v. City of Bos., 304 F.3d 110,

115 (1st Cir. 2002)), nor may it stand on "conclusory assertions

[]or unfounded speculation," Hochendoner v. Genzyme Corp., 823

F.3d 724, 731 (1st Cir. 2016).

        To satisfy the redressability requirement, "the

plaintiff [must] allege 'that a favorable resolution of [its] claim

would likely redress the professed injury.'" Dantzler, Inc. v.

Empresas Berríos Inventory & Operations, Inc., 958 F.3d 38, 47

(1st Cir. 2020) (second alteration in original) (quoting Katz, 672

F.3d at 72).  Though redress need not be certain, "it cannot be

merely speculative." Id.  Likewise, the plaintiff "need not

demonstrate that its entire injury will be redressed by a favorable

judgment, [but] it must show that the court can fashion a remedy that will at least lessen its injury." Id. at 49.

Because La Liga must show that both elements are satisfied as to each defendant, we will analyze causation and redressability separately for all three sets of defendants.

### 1. Standing as to the Executive Branch Defendants

The district court concluded that La Liga lacked standing to sue the executive branch defendants, citing both lack of causation and redressability. We agree.

La Liga has not shown that its injury is fairly traceable to the executive branch defendants. As La Liga frames the issue, the executive branch defendants benefitted from the disputed funds only after they "caved-in to the pressure of the Oversight Board['s]" "demand[s]." Nonetheless, La Liga insists that the executive branch defendants bear some responsibility for the municipalities' losses, as nothing "force[s] [them] . . . to comply with the illegality" of the Board's efforts. Rather, La Liga contends, these defendants have a "duty to act according to the law" and also have "fiduciary duties" to the municipalities. These vague assertions in La Liga's appellate briefing do not overcome the fact that it has not plausibly pled how the executive branch defendants breached any such duties in this case, nor even that they possess fiduciary duties to the municipalities. See A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 83 (1st Cir.

2013) (explaining that causation is lacking when based on "conclusory statement[s] . . . wholly unsupported by factual allegations sufficient to make the plaintiff's claim plausible").

Moreover, as the district court pointed out, La Liga does not explain how the executive branch defendants have "legal authority to direct the application of funds in a manner contrary to the governing budgets and fiscal plans approved by the Oversight Board." [Add. 007] La Liga has not adequately alleged that "in fact, the asserted injury was the consequence of the defendants' actions" or omissions, Warth v. Seldin, 422 U.S. 490, 505 (1975), when it fails to show that the executive branch defendants had any authority to directly refuse or return the funds diverted to them.

For similar reasons, La Liga has not established that a judgment against the executive branch defendants would likely redress the municipalities' injury. As our causation discussion illuminates, La Liga has not provided any basis in its complaint from which to conclude that these defendants have the authority to directly return the disputed funds to the municipalities. La Liga has thus not satisfied the redressability requirement.

In reaching this conclusion, we reject La Liga's contention that it has standing with respect to the executive branch defendants because they are indispensable parties under Federal Rule of Civil Procedure 19(a)(1). Whether a party is indispensable to an action has no bearing on whether the court has

- 44 -

subject matter jurisdiction over that party.  Indeed, where a court lacks subject matter jurisdiction over a party, that party may not be joined.  See, e.g., Picciotto v. Cont'l Cas. Co., 512 F.3d 9, 22, 22 n.19 (1st Cir. 2008) (stating that joinder that "destroy[s] diversity" will "eliminat[e] any basis for original jurisdiction").  Thus, putting the executive branch defendants' purported indispensability aside, whether they are indispensable is irrelevant to whether La Liga has standing to sue them.

We thus affirm the district court's order dismissing the complaint as to the executive branch defendants for lack of standing.

**2. Standing as to CRIM**

CRIM did not challenge La Liga's standing in its motion to dismiss but appears to do so now.[21]  CRIM's failure to timely raise its standing arguments is of no consequence, however, because we must confirm our jurisdiction.  See Ryan, 974 F.3d at 17 n.4.

La Liga's complaint asserts that CRIM directly caused the municipalities' injury, alleging that "CRIM illegally withheld all disbursements to which the Municipalities were entitled and

---

[21] In its appellate brief, CRIM incorrectly claims that the district court dismissed La Liga's complaint against it for lack of standing.  The district court's standing analysis addressed only the "government parties," by which it meant AAFAF, ASES, and the ERS administrator.  CRIM's briefing largely regurgitates the district court's standing analysis for those parties, suggesting that the analysis also applies to CRIM.

diverted the monies to the Retirement System and to ASES." To be sure, the complaint also blames that action on the Board's "unilateral decision" and the Board's pressuring CRIM to comply. Nonetheless, CRIM's role in shepherding the disputed funding away from the municipalities -- even begrudgingly -- is enough to establish CRIM's place in the "chain of causation" resulting in the municipalities' injury. Weaver's Cove Energy, LLC v. R.I. Coastal Res. Mgmt. Council, 589 F.3d 458, 467 (1st Cir. 2009) (quoting Bennett v. Spear, 520 U.S. 154, 169 (1997)).

Relief against CRIM could also conceivably redress the municipalities' injury. Just as CRIM diverted the disputed funding in the first place, La Liga has asked the "court [to] fashion a remedy that will at least lessen [that] injury" by ordering CRIM to cease that activity and redirect future funds to make up for the revenue wrongfully withheld. Dantzler, 958 F.3d at 49.

Accordingly, the complaint against CRIM survives as a matter of standing.

### 3. Standing as to the Board

Lastly, we consider La Liga's standing to sue the Board. La Liga has alleged that the Board caused the municipalities' alleged injury by orchestrating the repayment of the disputed funds. In addition, a court could likely redress that injury by declaring the Board's interpretation of the O&O incorrect and

- 46 -

enjoining its actions. The three elements of standing are thus easily satisfied.

**III.**

Having confirmed La Liga's standing to sue the Board and CRIM, we proceed to their assertion that the O&O did not void Law 29 ab initio and thus did not apply to the challenged period. La Liga presses two lines of attack against the Board's efforts to recover the funds retained by the municipalities during the challenged period: (1) that the O&O was not intended to nullify Law 29 from the time of its enactment and (2) even if the Title III court did intend as much, it lacked that authority and, hence, its order should not be construed to do so.

## A. The Intended Effect of the Order and Opinion

The court whose judgment is now on appeal is the same court that authored the O&O. A court asked to construe the scope and meaning of its own order is no doubt a persuasive authority. See, e.g., Lampkin v. UAW, 154 F.3d 1136, 1147 (10th Cir. 1998) (rejecting appellants' argument contesting the district court's interpretation of its pre-trial order because "[t]he district judge's interpretation of his own order is, of course, the most authoritative"). Here, the district court stated that La Liga had "misread[] the O&O, in a manner fatal to the Complaint," that "[t]he intended effect of the O&O could not be clearer," and that La Liga's arguments to the contrary were "unfounded and illogical."

The district court's emphatic rejection of La Liga's reading of the order is telling.

Moreover, the district court's interpretation of the O&O is supported by the order's text. The O&O repeatedly refers to Law 29 as a "nullity." See Vázquez Garced, 616 B.R. at 247-48, 256 n.11. That word choice indicates that the Title III court determined that Law 29 was legally invalid and never operative. See, e.g., Nullity, Black's Law Dictionary (11th ed. 2019) ("Something that is legally void."). The court reinforced that notion by repeatedly stating that Law 29 was "of no effect." See Vázquez Garced, 616 B.R. at 250, 251, 254, 256. On this score, we find instructive "the general rule . . . 'that a void act cannot operate to repeal a valid existing statute,' meaning that the existing statute 'remains in full force and operation as if the repeal had never been attempted.'" LaRoque v. Holder, 650 F.3d 777, 791 (D.C. Cir. 2011) (quoting Conlon v. Adamski, 77 F.2d 397, 399 (D.C. Cir. 1935)). In such circumstances, "[t]he prior statute is 'revived' to avoid a chaotic hiatus in the law." Aroostook Band of Micmacs v. Ryan, 484 F.3d 41, 62 n.27 (1st Cir. 2007) (quoting White Motor Corp. v. Citibank, N.A., 704 F.2d 254, 261 (6th Cir. 1983)). By declaring Law 29 a "nullity" and "of no effect," the O&O necessarily meant that the municipalities' preexisting pension and healthcare funding obligations "remain[ed]

- 48 -

in full force and operation," including during the challenged period.  Conlon, 77 F.2d at 399.[22]

An additional textual clue comes from the O&O's discussion of several Joint Resolutions enacted in 2018, which the Board had also challenged as unauthorized reprogramming.  See Vázquez Garced, 616 B.R. at 248-50.  The defendants argued that this challenge was moot because the Joint Resolutions were one-off spending bills that had already been implemented.  The Title III court, however, concluded that PROMESA's prohibition on unauthorized reprogramming "incorporates no temporal limitations; it prohibits both the adoption and the carrying out of unapproved reprogramming legislation."  Id. at 249 (emphasis added).  Finding both Law 29 and the Joint Resolutions to be unauthorized reprogramming, the court declared them both "unenforceable and of no effect."  Id. at 250.  This declaration as to the Joint Resolutions could only have been backward-looking.  Likewise, the O&O invalidated the adoption of Law 29, not merely its ongoing enforcement.

Indeed, even the defendants in the prior Law 29 litigation made clear that they understood the O&O to wipe out Law

_____

[22] As previously noted, those preexisting obligations required the municipalities to complete a monthly "PayGo" fee to reimburse the Commonwealth for pension disbursements to retired municipal employees under Act 106, as well as to contribute to their employees' health insurance plans as required by Puerto Rico law.

- 49 -

29 from inception. They stated in a motion following the O&O that they were negotiating with the Board "regarding feasible alternatives to unwind the effects of Act 29" and to "cover . . . the shortfall created by Act 29's invalidation." See Defs.'s Informative Mot. Re. Act 29 at 2, In Re Fin. Oversight & Mgmt. Bd. for P.R., Title III Case No. 17-BK-3283, Adv. Proc. No. 19-393-LTS (D.P.R. May 6, 2020), ECF No. 109. If the meaning of the O&O was clear to the parties immediately upon its issuance, we see no reason to credit La Liga's contrary interpretation now.

La Liga offers several arguments in support of its alternative reading, but none is persuasive. First, La Liga points out that the Title III court never expressly stated that Law 29 was void ab initio. But, as we have detailed, the language used in the O&O -- referring to the law's invalidity -- made clear that it covered the challenged period. The court did not have to use La Liga's preferred magic words. Cf. Brown v. Davenport, 596 U.S. 118, 141 (2022) ("[T]his Court has long stressed that 'the language of an opinion is not always to be parsed as though we were dealing with [the] language of a statute.'" (alteration in original) (quoting Reiter v. Sonotone Corp., 442 U.S. 330, 341 (1979))).

La Liga also invokes Federal Rule of Civil Procedure 65(d), which sets forth specific requirements for injunction orders, as further support for its argument that the O&O failed to clearly void Law 29 ab initio. But that rule applies only to

- 50 -

injunctions and restraining orders, not to declaratory relief. Although the O&O provided injunctive relief, it invalidated Law 29 by means of a declaration. La Liga's reliance on Gunn v. University Committee to End War in Viet Nam, 399 U.S. 383 (1970), is thus unavailing. See id. at 388-89 (noting the requirements for specificity for "any order granting an injunction").

La Liga next argues that the Title III court's entry of injunctive relief is inconsistent with construing the O&O to nullify Law 29 retroactively for the challenged period. To be sure, "[o]rdinarily, grants of equitable relief apply prospectively rather than retroactively. That is why, for example, plaintiffs must show a need for prospective relief in order to obtain an injunction." Khalil v. Ashcroft, 370 F.3d 176, 179 (1st Cir. 2004). But La Liga's argument largely elides the declaratory relief in the O&O, which declared that Law 29 was a "nullity" and "of no effect." See, e.g., Vázquez Garced, 616 B.R. at 256 ("Law 29 and the Joint Resolutions are hereby declared unenforceable and of no effect. Defendants are, furthermore, permanently enjoined from implementing and enforcing Law 29.").

Putting "[f]uture relief aside," we have acknowledged the "current utility" of "a declaration as to the lawfulness of . . . particular acts described in [the] complaint" to determine the parties' rights and obligations going forward. Verizon New England, Inc. v. Int'l Bhd. of Elec. Workers, Local

No. 2322, 651 F.3d 176, 189-90 (1st Cir. 2011); see also Restatement (Second) of Judgments § 33 cmt. a (Am. L. Inst. 1982) ("[W]hile the declaratory action is perhaps most important as a kind of preventive device, its use is not so restricted; it is also sometimes permitted after the wrong has been committed."). The O&O declared Law 29 invalid from its inception, meaning the Commonwealth lacked a legal basis to divert funds to the municipalities during the challenged period.[23]

Finally, La Liga insists that the Title III court could only have intended to nullify Law 29 prospectively because it

---

[23] Given our recognition that declarations may address the lawfulness of past actions, La Liga's invocation of out-of-circuit cases noting the generally prospective nature of declaratory relief do not advance its argument to the contrary. See McGee v. Solic. Gen. of Richmond Cnty., 727 F.3d 1322, 1325 (11th Cir. 2013); CMR D.N. Corp. v. City of Philadelphia, 703 F.3d 612, 628 (3d Cir. 2013); AmSouth Bank v. Dale, 386 F.3d 763, 786 (6th Cir. 2004). For instance, the observation in CMR D.N. Corp. that "declar[ing] the rights of litigants" is "by definition prospective in nature" does not conflict with the notion that those rights can be informed by a statute's prior validity (or lack thereof). 703 F.3d at 628 (quoting Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995)).

The other cases La Liga cites are even less apt. The statement in Nextel Partners Inc. v. Kingston Township, 286 F.3d 687, 693 (3d Cir. 2002), that "a request for a declaratory judgment that a statutory provision is invalid is moot if the provision has been substantially amended or repealed" is irrelevant since Law 29 had not been repealed or modified. Indeed, that statement only confirms that a declaration of a statute's invalidity is sometimes available. And Steffel v. Thompson, 415 U.S. 452 (1974), which generally describes the purpose of the Declaratory Judgment Act, does not suggest that declaratory relief may have only prospective impact. See id. at 466-67.

stayed the effect of its order. La Liga argues that, if Law 29 was a nullity from its inception, such a stay would have been impossible. But the Title III court's postponement of the O&O's effective date says nothing about the validity of Law 29 during the challenged period. The court allowed that delay at the defendants' request. See Vázquez Garced, 616 B.R. at 257. At the summary judgment hearing, the defendants explained that it would take time for "the municipalities, the Oversight Board, and the government [to] work together to try to come up with another solution" because the nullification of Law 29 would "immediately [impose] a huge gap in [the municipalities'] budgets that they won't be able to bridge." Transcript of Omnibus Hearing at 36:11-19, In re Fin. Oversight & Mgmt. Bd. for P.R., Title III Case No. 17-BK-3283, Adv. Proc. No. 19-393-LTS (D.P.R. Mar. 10, 2020), ECF No. 105. The Board consented to the delay, emphasizing that "what we're ultimately asking for is the law to be nullified so that the past infractions can be corrected." Id. at 39:20-23. Thus, the court granted the delay specifically because of the perceived fiscal impact on the municipalities of voiding Law 29 ab initio.

## B. The Title III Court's Authority to Nullify Law 29

La Liga also argues that, regardless of the Title III court's intent, the court lacked the power to nullify Law 29 from

inception, and thus its order should not be construed to do so.[24] La Liga argues that PROMESA does not authorize the Title III court to void a duly enacted law ab initio.  La Liga also appears to argue that federal courts, as a general matter, lack such authority.  Accordingly, the only permissible reading of the O&O is that it does not nullify Law 29 for the challenged period.

### 1. The Title III Court's Authority Under PROMESA

PROMESA expresses one limitation on the Title III court's powers that is potentially relevant to its authority to invalidate a Puerto Rico law from its inception.  Section 305 of the Act states:

> Subject to the limitations set forth in subchapters I and II of this chapter, notwithstanding any power of the court, unless the Oversight Board consents or the plan so provides, the court may not, by any stay, order, or decree, in the case or otherwise,

---

[24] As we understand La Liga's argument about the Title III court's authority, it is focused on how to interpret the O&O and is not a challenge to the validity of the order.  In other words, La Liga accepts for the purposes of this appeal that the O&O correctly declared Law 29 invalid but argues that, if the Title III court lacks the authority to void a law ab initio, the O&O should not be interpreted to have done so.  We thus reject the Board's characterization of La Liga's challenge as an improper collateral attack on the O&O.  Moreover, the Board did not raise this argument below.  See United States v. Parrilla Bonilla, 648 F.2d 1373, 1386 (1st Cir. 1981) ("[A]ppellate courts will not ordinarily consider theories presented for the first time on appeal.").  For similar reasons, we decline to consider the Board's alternative argument -- likewise raised first on appeal -- that La Liga is collaterally estopped from making these arguments.

interfere with— (1) any of the political or governmental powers of the debtor . . . .

48 U.S.C. § 2165. Hence, when the Board asks the Title III court for relief -- necessarily consenting to that action -- PROMESA does not limit the Title III court's authority to grant the request, so long as it accords with Title I and Title II of the Act, which lay out the Board's organization and responsibilities. La Liga has not pointed to any limitation expressed within Title I or Title II of PROMESA preventing the Board from asking the Title III court to void a Puerto Rico law ab initio, nor have we identified any. To the contrary, multiple provisions of the Act underscore the Board's ability to make that request, and the Title III court's authority to grant it.

PROMESA grants the Board far-ranging "authority to object to, and block the implementation of, local laws that are inconsistent with efforts to return the Commonwealth to fiscal solvency." Pierluisi, 37 F.4th at 750; see also 48 U.S.C. § 2124(h) ("[T]he Oversight Board shall ensure the purposes of this [Act] are met."). PROMESA authorizes the Board to vindicate that broad mandate in court by "seek[ing] judicial enforcement of its authority to carry out its responsibilities under [the Act]." Id. § 2124(k). The Board points to several wellsprings of authority within PROMESA that justify invalidating Law 29 from the time of enactment.

First, there is the "multi-step, back-and-forth process by which the Oversight Board reviews Commonwealth legislation for consistency with the statute's goals." Pierluisi, 37 F.4th at 751. As relevant here, section 204(a) of PROMESA requires the governor to certify any new law's compliance with the Fiscal Plan and authorizes the Board to reject that certification and "direct the Governor to provide the missing estimate or certification." 48 U.S.C. § 2144(a)(4)(A). The governor's failure to comply authorizes the Board to "take such actions as it considers necessary, consistent with this [Act], to ensure that the enactment or enforcement of the law will not adversely affect the territorial government's compliance with the Fiscal Plan, including preventing the enforcement or application of the law." Id. § 2144(a)(5) (emphasis added).

Section 204(a)'s certification procedure begins after Puerto Rico has "duly enact[ed]" a law -- the deadline for the governor's certification is seven business days later.[25] Id.

---

[25] La Liga seizes upon PROMESA's reference to "duly enact[ed]" statutes because in the opinion now on appeal, the district court stated that Law 29 "was not duly enacted" to explain the O&O's conclusion that Law 29 was invalid. PROMESA's certification requirement only applies once a statute has been "duly enact[ed]," and thus Law 29 was necessarily "duly enacted" within the meaning of PROMESA. La Liga argues, therefore, that the district court's remark betrays its misunderstanding of the statutory scheme, which does not, in La Liga's telling, allow the Title III court to invalidate a Puerto Rico law based on a finding that it was not duly enacted. La Liga's objection misses the district court's point. Law 29 was "duly enacted" as the term is used in section

§ 2144(a)(1).  By authorizing the Board to "prevent[]" the "application" of that law, section 204(a)(5) plainly empowers the Board to oversee Puerto Rico's legislative enactments and ensure their compliance with the Fiscal Plan from the moment of their enactment.  If it were otherwise, Puerto Rico could simply circumvent PROMESA by enacting laws with only brief effect, regardless of their consistency with the Act or the Fiscal Plan.[26] PROMESA also expressly authorizes the Board to seek judicial enforcement of its power to prevent the application of Puerto Rico laws.  See 48 U.S.C. § 2124(k).

---

204(a), having undergone the necessary steps to enact legislation under Puerto Rico's constitution.  However, in saying that Law 29 was not "duly enacted," the district court was simply referring to the incomplete certification process required by PROMESA.  Having failed to meet that requirement, Law 29 was invalid.

Nor does La Liga's argument gain any traction from its citation to Financial Oversight & Management Board for Puerto Rico v. Pierluisi (In re Financial Oversight & Management Board for Puerto Rico), 634 B.R. 187, 194 (D.P.R. 2021).  Although the court there noted that Puerto Rico retains legislative power under PROMESA, it recognized that "PROMESA gives the Oversight Board authority to seek judicial relief thwarting actions that the Oversight Board has determined frustrate or impair the purposes of PROMESA, and provides that the statute preempts inconsistent local laws and regulations."  Id. at 194 n.7.

[26] We find it relevant, moreover, that Puerto Rico has occasionally delayed or ignored its certification obligation.  See, e.g., Pierluisi, 37 F.4th at 753-54 (noting delays of one and three months).  If the Title III court could not declare laws null from the time of their enactment, such delay tactics might be rewarded by helping Puerto Rico further extend the shelf life of patently improper laws.

Second, the Board finds additional textual support for the Title III court's authority to nullify Law 29 in section 108(a)(2) of PROMESA. That section prohibits Puerto Rico from "enact[ing], implement[ing], or enforc[ing] any statute . . . that would impair or defeat the purposes of this [Act], as determined by the Oversight Board." 48 U.S.C. § 2128(a)(2). The section affords the Board discretion to determine that a Commonwealth statute "impair[s] or defeat[s]" the purposes of PROMESA, "trigger[ing] a statutory prohibition on action by the Government to go forward with the targeted statute." Pierluisi, 37 F.4th at 758 n.9 (quoting Vázquez Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 511 F. Supp. 3d 90, 134 (D.P.R. 2020)). Having made that determination, section 104(k) empowers the Board to ask the Title III court to declare that such a law was improperly "enact[ed]," making it a nullity. 48 U.S.C. § 2128(a)(2).

Third, the Board points out that the Title III court also relied upon section 204(c) to find Law 29 a "nullity" and "of no effect." See Vázquez Garced, 616 B.R. at 249-50. That section prohibits Puerto Rico's government from "adopt[ing]" or "carry[ing] out any reprogramming [of budgeted funds], until the Oversight Board has provided the Legislature with an analysis that certifies such reprogramming will not be inconsistent with the Fiscal Plan and Budget." 48 U.S.C. § 2144(c)(2). Again, the

statute's language makes it clear that the Commonwealth cannot simply ignore PROMESA and expect its actions to have lasting legal effect that the Title III court is powerless to invalidate. Under section 204(c), the Board's approval is a prerequisite to any reprogramming of budgeted funds. Necessarily, the remedy for an unauthorized reprogramming would, in certain cases, be its nullification ab initio. Otherwise, the Title III court could not remedy the Commonwealth's adoption of an unauthorized reprogramming, leading to an instant, on-off expenditure of unbudgeted funds.

We find persuasive these multiple sources of statutory authority confirming the Board's power to prevent laws inconsistent with PROMESA from taking effect, as well as the Title III court's concomitant authority to enforce the Board's mandates by nullifying such a law from its inception. Unable to locate any support in PROMESA for its competing assertion that the Title III court could not declare Law 29 a nullity, La Liga claims that we implied as much in Pierluisi. La Liga misreads our decision. We simply noted there that the Title III court had "dismissed all claims for 'nullification' because the Board 'ha[d] not demonstrated that such drastic relief [was] warranted under the particular circumstances.'"  37 F.4th at 758 n.9 (alteration in original) (quoting Vázquez Garced, 511 F. Supp. 3d at 128, 131, 133, 138).  Nothing in that statement, or in the district court's

underlying opinion, suggests that nullification is never available.  To the contrary, we recently affirmed the Title III court's "nullif[ication]" of another Puerto Rico law "and any actions taken to implement it."  Fin. Oversight & Mgmt. Bd. for P.R. v. Pierluisi-Urrutia (In re Fin. Oversight & Mgmt. Bd. for P.R.), 77 F.4th 49, 59 (1st Cir. 2023), aff'g 650 B.R. 334 (D.P.R. 2023).

Lastly, La Liga insists that if the Board wanted to block enforcement of the statute from the time of its enactment, it should have sought a preliminary injunction or a temporary restraining order.  While this step may have been wise litigation strategy, the Board's failure to seek such relief sheds no light on what PROMESA empowers the Board or the Title III court to do.  Indeed, without speculating about whether a request for preliminary relief would have been granted,[27] if the Title III court had denied temporary relief, that denial would not "preclude an examination of whether [the Board] should nonetheless be granted a declaratory judgment" of Law 29's invalidity with the benefit of full briefing on the ultimate merits of the law.  Verizon New England, 651 F.3d at 189 (first citing Powell v. McCormack, 395

---

[27] The Board suggests that it may have been unable to obtain temporary relief because its harms would be purely financial, and thus not irreparable.  See, e.g., CMM Cable Rep., Inc. v. Ocean Coast Props., Inc., 48 F.3d 618, 622 (1st Cir. 1995) (explaining that economic harm, "without more, rarely constitutes an adequate basis for injunctive relief").

U.S. 486, 499 (1969); and then citing Zwickler v. Koota, 389 U.S. 241, 254 (1967)).  Rather, "declaratory relief is alternative or cumulative" to interim relief.[28]  Id.

We thus conclude that PROMESA authorized the Title III court to invalidate Law 29 from the time of its enactment, and thus the O&O can be read to do so.

**2.  The Title III Court's Fundamental Authority to Declare Law 29 a Nullity**

La Liga's final argument relies on a novel and somewhat perplexing theory of judicial power.  La Liga insists that the Title III court "lacked any authority to preclude Law 29 from coming into effect" but "could only enjoin its enforcement," and thus the O&O cannot be read to invalidate Law 29 from its inception.[29]  We disagree.  A federal court's authority to declare

---

[28] We recognize the potential unfairness to the municipalities of the Board's failure to attempt to block Law 29's application from the outset, which would have prevented the municipalities from accruing a large debt to the Commonwealth in reliance on Law 29.  However, La Liga has made no such equitable argument, either before the district court or on appeal.  Moreover, we find it relevant to note that the Board warned Puerto Rico's government, before Law 29's enactment, that the law was likely invalid.  See Vázquez Garced, 616 B.R. at 242, and thus the municipalities were on notice of the risk that the law would be voided and the municipalities obligated to repay the funds wrongfully withheld.

[29] Virtually the sole authority upon which La Liga relies to support this assertion is a law review article.  See Jonathan F. Mitchell, The Writ-of-Erasure Fallacy, 104 Va. L. Rev. 933, 987 (2018) ("[N]either the courts nor the executive has the power to prevent a duly enacted statute from taking effect.  All that a court can do is decline to enforce the statute and enjoin the executive from enforcing it.").  The basis for Mitchell's contention is his observation that "[t]he federal courts have no

a law void ab initio is well settled.  See, e.g., Mass. Ass'n of

Health Maint. Orgs. v. Ruthardt, 194 F.3d 176, 178 (1st Cir. 1999)

("By virtue of [the Supremacy Clause], state law that conflicts

with federal law is a nullity."); Antilles Cement Corp. v. Fortuño,

670 F.3d 310, 323 (1st Cir. 2012) ("Consequently, state laws that

'interfere with, or are contrary to the laws of Congress' are void

ab initio." (quoting Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 211

(1824))).

Indeed, as mentioned already, we have affirmed a

declaration by the Title III court "nullifying" a Puerto Rico law

"and any actions taken to implement it."  Pierluisi-Urrutia, 77

F.4th at 59, 66.  That order, much like the O&O under consideration

---

authority to erase a duly enacted law from the statute books, and
they have no power to veto or suspend a statute."  Id. at 936.
Thus, while in popular parlance a court "strikes down" an invalid
law, "the statute continues to exist . . . and it remains a law
until it is repealed by the legislature that enacted it."  Id.  A
"future court" remains free to "reviv[e] and enforc[e] the formerly
disapproved statute."  Id. at 942.

Without opining on the ideas the author expresses, it is clear
to us that the article does not lend La Liga any support.  Indeed,
the article agrees that "retroactivity is ubiquitous in the law,"
that this is "especially true of judicial decisionmaking," and
that judicial decisions often have "retroactive effect beyond the
parties to the lawsuit."  Id. at 996.  It is impossible to square
these elementary principles with La Liga's apparent contention
that the Title III court could not have declared Law 29 ineffective
from its inception.  Nor in doing so did the Title III court
exercise an unwarranted judicial veto over Puerto Rico's
legislative enactments, as La Liga's misplaced reliance on
Mitchell's article seems to suggest.  It simply adjudicated the
law's validity in light of PROMESA.

here, declared the contested law void ab initio due to Puerto Rico's failure to submit a proper formal estimate of the law's fiscal impact and upon the Board's determination that the law "impair[s] or defeat[s] the purposes of [PROMESA]." Id. at 58 (alterations in original). As the Title III court aptly put it, "[t]he only way to prevent the enforcement and application of the law . . . [was] to nullify it ab initio." Pierluisi-Urrutia, 650 B.R. at 358 (citing 48 U.S.C § 2144(a)(5)).

Here, acting similarly, the Title III court simply exercised its authority to award "an immediate and definitive determination of the legal rights of the parties," Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 241 (1937), when it declared that Law 29 was invalid because it flouted the requirements of PROMESA and that, as a result, Puerto Rico's municipalities were never validly relieved of their obligation to fund their employees' pensions and health care plans.[30]

The Title III court unquestionably had the authority to make that declaration. Accordingly, we find no fault in the

---

[30] La Liga stresses throughout its brief that the municipalities were not parties to the litigation and thus should not be bound by the O&O. But the Board never sought to enforce the O&O against the municipalities. Rather, it negotiated with Puerto Rico's central government to recover the funds unlawfully withheld under Law 29. Moreover, as political subdivisions of the Commonwealth, the municipalities were likely in privity with the defendants in the Law 29 litigation, as reflected by the district court's orders finding the municipalities' interests adequately represented. See supra note 2.

- 63 -

Board's interpretation of the O&O to cover the challenged period and its efforts to retrieve the funds withheld by the municipalities under Law 29.

**IV.**

The O&O declared Law 29 "a nullity" and "of no effect." We agree with the district court that this judgment retroactively applied to Law 29 from its inception. Accordingly, we affirm the dismissal of La Liga's complaint.

So ordered.

**-Dissenting Opinion Follows-**

**BARRON, <u>Chief Judge, dissenting</u>.** Suppose a voluntary membership organization wants to sue to redress an injury to a non-member. Does the organization have Article III standing to do so if none of its members do? One might think that the answer must be no, given that neither the organization nor any of its members has been injured. But the majority concludes that "well-settled standing principles," reveal that the answer is clearly yes. For that reason, the majority holds that Liga de Ciudades de Puerto Rico ("La Liga") -- whose members are mayors of Puerto Rican municipalities -- has Article III standing to sue here to redress injuries that only the member-mayors' municipalities have suffered. Moreover, according to the majority, La Liga has such standing even though the organization has not so much as mentioned the theory of standing on which the majority relies.

In my view, there are no "well-settled principles" that justify our overlooking La Liga's appellate waiver. Accordingly, I respectfully dissent, especially because, in sua sponte finding organizational standing here, the majority is setting a novel precedent that risks undermining the ability of governments at all levels of our democratic system to determine who will represent them in federal court.

## I.

There is no doubt that La Liga bears the burden of establishing that it has standing. Nor is there any doubt that we

must look to La Liga's complaint to determine whether that burden has been met.  See Lujan v. Defs. of Wildlife, 504 U.S. 555, 562 (1992).  The complaint makes the following pertinent allegations.

"La Liga is a not-for-profit and nonpartisan corporation organized and existing pursuant to the Laws of the Commonwealth of Puerto Rico, whose members are Mayors of Municipalities of Puerto Rico."  La Liga's "mission is 'to strengthen the capacity of local governments and communities in order to better face the various social, structural, fiscal and governance challenges.'"

In service of that mission, "La Liga develops and implements various initiatives, tempered to the needs and realities of municipal governments and their communities."  The most recent of those "initiatives" is the one in which the organization seeks "to defend the decimated municipal finances from the onslaught of austere measures imposed by the [Financial Oversight and Management Board for Puerto Rico]."

The complaint then concludes as to standing as follows:

La Liga has organizational standing to bring this action since the strengthening of the municipal finances is germane to La Liga's mission and purpose, the Municipalities that are headed by La Liga's members have suffered substantial economic losses as a result of the illegal withholding and diversion of municipal funds by Defendant Centro de Recaudación de Ingresos Municipales . . . to off-set inexistent debts, and the participation of the individual La Liga members is not necessary for the issuance of the remedies herein requested.

To the majority, these limited allegations so clearly show that La Liga has standing that La Ligan need not make any further argument that it does. The majority explains that is so because of the "well-settled standing principles," that were set forth by the Supreme Court of the United States in Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333 (1977), and are reflected in our Court's decision in Railway Labor Executives' Ass'n v. Boston & Maine Corp. ("RLEA"), 808 F.2d 150 (1st Cir. 1986). But I cannot see how those "principles" show as much.

**II.**

In Hunt the Supreme Court made clear that a "traditional voluntary membership organization" may have standing to sue even if it has not been injured. 432 U.S. at 342-43. Such an organization, the Court explained, may base its standing on an injury to one of its members. But, to do so, the organization must show that: (a) the member "would otherwise have standing to sue in their own right [based on the injury in question]; (b) the interests [the organization's claim] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Id. at 343. But cf. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock, 477 U.S. 274, 289, 290 (1986) ("We are not prepared to dismiss out of

hand the . . . concern that associations allowed to proceed under Hunt will not always be able to represent adequately the interest of all of their injured members" because such an association "might lack resources or experience or might bring lawsuits without authorization from its membership," or because "the litigation strategy selected by the association might reflect the views of only a bare majority -- or even an influential minority -- of the full membership.").

The complaint reveals that La Liga sought to rest its standing in this case on this three-part test. The majority rightly recognizes, however, that La Liga cannot do so. The only members that La Liga claims to have are the mayors, while the only injuries that it alleges were to the non-member municipalities.

To be sure, the Supreme Court did later refine Hunt's three-part test. It held that a traditional voluntary membership organization sometimes can base its standing on the standing of one its members to redress an injury to a third party. See N.Y. State Club Ass'n, Inc. v. City of New York, 487 U.S. 1, 9 (1988). But this refinement also does not help La Liga, as the record does not suggest that any member-mayor's standing to bring this suit could rest on an injury to that mayor's municipality. See City of Bos. Delegation v. FERC, 897 F.3d 241, 248-50 (D.C. Cir. 2018) (holding that the Mayor of the City of Boston lacked standing to represent the City where the only identified support for that

authority was the fact that "the Mayor regularly initiated litigation on behalf of the City," and the specified process by which the City's Code permitted the City to initiate litigation did not give the mayor unilateral authority to bring suit). In fact, the majority does not disagree, as it asserts that a member-mayor's authority to bring suit to redress an injury to that mayor's municipality is simply "not relevant to" La Liga's standing in this case. Maj Op. at 19.[31]

Why, then, does the majority think that <u>Hunt</u> clearly supports La Liga's standing here? The majority's answer depends on the additional organizational standing test -- often referred to as the "indicia of membership" test -- that <u>Hunt</u> also sets forth. And that is so, according to the majority, even though La Liga has not mentioned the test at any point in this litigation, including after a question was specifically raised at oral argument about how the organization could have standing if none of the member-mayors did. The majority thus appears to be of the view

_____

[31] A Puerto Rico statute does provide that a mayor may "[r]epresent the municipality in juridical or extra-juridical actions brought by or against the municipality" but that a "mayor may not acquiesce to . . . any suit in any procedure or action in which the municipality is a party, without the prior consent of the absolute majority of the members of the municipal legislature." 21 L.P.R. § 4109(e). Needless to say, we have no briefing from La Liga about the possible relevance of this measure to its standing, and, in the absence of La Liga's having addressed it, I do not read this measure to so obviously settle the question of mayoral authority to sue that it is dispositive of that question.

that it is so clear that La Liga has standing under this test that the organization need not make any argument that it does. But, insofar as that is the majority's view, I cannot agree.

### III.

By way of background, Hunt developed the "indicia of membership" test to address a peculiar issue that arose in that case. A state-created entity, the Washington State Apple Advertising Commission ("Commission"), had claimed that it had standing to sue based solely on injuries to apple growers and dealers in that state. See Hunt, 432 U.S. at 336, 342.

Hunt explained that it was clear that, under the three-part test described above, a traditional trade association of apple growers and dealers could sue based on injuries that only its grower- and dealer-members had suffered. See id. at 342-43. Hunt acknowledged, though, that the Commission was not itself such an association, "for it ha[d] no members at all." Id. at 342.

So, Hunt moved on to address the separate contention that the Commission nonetheless could rest its standing on the injuries to the state's apple growers and dealers. See id. at 344. The Court then held that the Commission could because, in function rather than form, the Commission's relationship to those growers and dealers was no different from a traditional trade association's relationship to its members. See id. at 344-46. The "indicia of membership" test was born, therefore, to test

whether the Commission, despite not being a traditional trade association, functioned in the way that one did.

The majority does not dispute this account of the "indicia of membership" test's origins. The majority nonetheless concludes that the test is relevant here, even though La Liga is -- unlike the Commission -- itself a traditional voluntary membership organization in all the ways that a traditional trade association is.

I do not see why the majority is so confident of this conclusion. It is one thing to conclude -- as Hunt did -- that an unusual entity, which a state created to promote a certain trade, has standing to sue based on injuries to participants in that trade just as a trade association would have standing to sue based on injuries to its members. It is quite another to conclude -- as the majority now does -- that such an association itself may claim "members" for standing purposes that it has voluntarily chosen to exclude from its ranks.

To that very point, after Hunt, the Court acknowledged concerns with allowing a traditional voluntary membership organization to rest its standing on injuries that only its members had suffered. See Brock, 477 U.S. at 289. Doing so, the Court explained, could raise questions in some circumstances about the representativeness of the organization with respect to the injured parties. See id. at 289-90. The Court then concluded that those

concerns were mitigated by the fact that "[t]he very forces that cause individuals to band together in an association will thus provide some guarantee that the association will work to promote their interests."  Id. at 290.

Injured parties that an organization has chosen to keep off its membership rolls, however, cannot be said to have "band[ed] together" in that organization.  Id.  Thus, Brock's rationale for allowing traditional voluntary membership organizations to sue based on injuries to their members has no application here.

Not surprisingly, then, nothing in Hunt clearly shows that the "indicia of membership" test applies to a traditional voluntary membership organization like La Liga.  And (setting RLEA aside for now) nothing in any of our own precedents does either.  Indeed, our most recent account of the test described it as applying to "organizations that are not voluntary membership organizations."  Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. ("SFA"), 980 F.3d 157, 183 (1st Cir. 2020), rev'd on other grounds, 600 U.S. 181 (2023) (emphasis added).

Nor is there a body of out-of-circuit precedent that suggests that it is "well-settled" that the "indicia of membership" test applies to an organization that already has members of its own.  To the contrary, some circuit-level authority goes the other way.  See Ne. Ohio Coal. for the Homeless v. Blackwell, 467 F.3d

999, 1013 (6th Cir. 2006) (McKeague, J., concurring) ("Insofar as plaintiffs' standing implicitly rests on assertion of the interests of <u>nonmembers</u> for whose interests plaintiff Northeast Ohio Coalition for the Homeless advocates, <u>e.g.</u>, homeless persons, plaintiffs are operating outside the bounds of traditional associational standing. They rely on a form of representational or third-party standing for which they have cited no controlling or even persuasive precedent."); <u>see also</u> <u>id.</u> at 1010 n.4 ("Judge McKeague's concurring opinion correctly notes that the Northeast Ohio Coalition for the Homeless apparently seeks to assert a form of representational standing never recognized by any court -- standing on behalf of the group served by the organization.").

The majority does enlist various out-of-circuit precedents to support the assertion that a voluntary membership organization may claim "members" under the "indicia of membership" test that the organization will not let become actual members. But a review of those cases turns up but two district-court decisions that, in applying the test, found that a voluntary membership organization could claim members for standing purposes that it had excluded from membership for all others. <u>See</u> <u>Sec. Indus. & Fin. Mkts. Ass'n</u> v. <u>U.S. Commodity Futures Trading Comm'n</u>,

67 F. Supp. 3d 373, 410 (D.D.C. 2014); Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 188 F. Supp. 2d 486, 498-99 (D.N.J. 2002).[32]

In other words, there plainly is a novel question for us to resolve about whether the "indicia of membership" test has any application to La Liga. I therefore do not see why we should excuse La Liga from having to address the question.

**IV.**

Let us posit, though, that (as the majority concludes) it would be "no great leap," to apply the "indicia of membership" test to a traditional voluntary membership organization like La Liga. The question still would remain as to whether it is "well[ ]settled" that the test is met in a case like this one. Here, too, the majority answers the question in La Liga's favor even though La Liga has not weighed in on it. But, again setting RLEA aside for the moment, I cannot agree with the majority's decision to give that answer.

---

[32] The majority asserts that the Third Circuit affirmed the standing ruling in Interfaith Community Organization v. Honeywell International, Inc., but it is not apparent that the Third Circuit did so based on the district court's "indicia of membership" ruling, as the Third Circuit simply said that "the individual plaintiffs," some of whom were formal members of the organization, "have standing, and [the defendant] does not challenge the District Court's membership findings." 399 F.3d 248, 258 (3d Cir. 2005). Thus, the Third Circuit may have held no more than that the plaintiff-organization had standing solely based on the injuries to its formal members.

Consider the factors that we most recently described as relevant to the "indicia of membership" test: whether the "organization's purpose is to protect and promote the interests of its non-members"; "whether these non-members are 'the primary beneficiar[ies] of [the organization's] activities,'"; "and whether [the] non-members elect its members, are the only people who may be members, or finance the organizations' activities, including litigation costs, through assessments levied upon them." SFA, 980 F.3d at 183 (quoting Hunt, 432 U.S. at 344-45) (first alteration in original). The majority concludes (albeit without the benefit of La Liga having so argued) that the first two of these indicia are present.

The majority recognizes that this conclusion does not suffice to show that the "indicia of membership" test is met. So, if we are going by the factors that we most recently said matter in applying the test, the dispositive questions would seem to be these: do "[the municipalities] elect [La Liga's] members"?; "are [the municipalities] the only [ones] who may be [La Liga's] members"?; and do the municipalities "finance the organizations' activities, including litigation costs, through assessments levied upon them"? Id. (citing Hunt, 432 U.S. at 344-45).

This is not a case, however, in which only the injured parties can be members of the organization that is seeking standing. It also is not one in which -- as far as the record

reveals -- the injured parties finance that organization.  Thus, insofar as our most recent account of what matters under the "indicia of membership" test is our guide, everything would appear to hinge on whether there is evidence of the "elect" factor.

SFA took the "elect" factor from Hunt.  It did so based on Hunt's reliance on the growers and dealers involved in that case having elected each of the commissioners onto the Commission. See Hunt, 432 U.S. at 344.  There is no similarly clear evidence here, however, that the "elect" factor is present.

La Liga's members were elected to their mayoral offices. They were not elected to La Liga.  It was only after each mayor had been elected to the office of mayor that -- from all the complaint reveals -- each mayor then either chose to join La Liga or not, seemingly as that individual mayor wished.

I do not see how it is evident that this factual distinction between our case and Hunt is immaterial.  The "indicia of membership" test exists to ensure that the organization that asserts standing based on an injury to a non-member in a "real sense . . . represents the [non-members] and provides the means by which they express their collective views and protect their collective interests."  Id. at 345.  It thus would seem quite material that the municipalities did not elect the mayors to La Liga and that the mayors instead merely chose to join the organization through the exercise of their own discretion.

I should add that there are other factual distinctions between our case and Hunt that also appear to be material. Hunt did not indicate that even direct election to the organization -- when combined with the organization's purpose being to benefit the injured parties and its activities primarily benefiting them -- showed the test was satisfied. The Court there also emphasized (1) the direct control that the commissioners exercised over the Commission, (2) that only growers and dealers could be commissioners, (3) the role that assessments levied on the dealers and growers played in funding the Commission, and (4) the fact that the conduct challenged in the Commission's suit -- North Carolina's prohibition on the sale of apples labeled as belonging to a particular state -- "could reduce the amount of the assessments due the Commission and used to support i[t]s activities." Id.

Indeed, the Court gave special weight to the fourth factor. It noted that, because of the "financial nexus" between the Commission and the relief sought in the litigation, "the interests of the Commission itself may be adversely affected by the outcome of this litigation." Id. The Court ultimately concluded that "[t]his financial nexus between the interests of the Commission and its constituents coalesce[d] with the other factors noted above to 'assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely

depends for illumination of difficult constitutional questions.'" Id. (emphasis added) (quoting Baker v. Carr, 369 U.S. 186, 204 (1962)).

We have no basis for concluding that any of the four ties enumerated above are present in this case. And we certainly have no basis for concluding that there is a "financial nexus" between La Liga's funding and the remedy that it seeks in this litigation.

The majority nonetheless concludes that these distinctions between this case and Hunt are trivial. It reasons that Hunt makes clear that the "indicia of membership" test is met so long as "the organization is sufficiently identified with and subject to the influence of those it seeks to represent as to have a 'personal stake in the outcome of the controversy.'" Or. Advoc. Ctr. v. Mink, 322 F.3d 1101, 1111 (9th Cir. 2003) (quoting Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 261 (1977)). "[A]ided by . . . judicial experience and common sense," the majority then goes on to conclude that La Liga clearly is such an organization "[c]onsidering the institutional, political, and legal mechanisms of accountability inherent in the relationship between a mayor and municipality" (quotation omitted) (emphases added). Accordingly, the majority concludes that it is so clear that La Liga satisfies the "indicia of membership" test that we

may overlook the fact that La Liga has failed to make any argument that it does.

Common sense does indicate that mayors play important roles within their local governments.  But city councils also wield power, while state and local laws distribute all kinds of powers among all kinds of city officials.  In fact, I know of no local jurisdiction that concentrates all its powers in a single executive.  I thus do not see how we can rely on common sense to conclude that mayors are the definitive decisionmakers as to all matters of consequence for their municipalities, let alone that La Liga's mayors have been entrusted to unilaterally make the fraught decision to sue a higher level of government that La Liga has made here.  See City of Bos. Delegation, 897 F.3d at 248-50; cf. Va. House of Delegates v. Bethune-Hill, 587 U.S. 658, 663 (2019) ("[I]f the State had designated the House to represent its interests, and if the House had in fact carried out that mission, we would agree that the House could stand in for the State.").  And so it is hard for me to see how it is at all clear that, even though La Liga has an interest in the well-being of Puerto Rico's municipalities, see Mink, 322 F.3d at 1111, La Liga "in a very real sense . . . provides the means by which [the municipalities] express their collective views and protect their collective interests" in relation to the litigation at hand.  Hunt, 432 U.S. at 345; see also Brock, 477 U.S. at 290 (focusing on this same concern).

There does remain to address our post-Hunt decision in RLEA. The majority appears to be of the view that this precedent clarifies whatever Hunt on its own does not when it comes to La Liga's standing. Here too, however, the majority relies on a highly debatable reading of precedent -- and a reading that, like the underlying precedent itself, La Liga has not even mentioned.

In RLEA, the Railway Labor Executives' Association ("RLEA") -- which, as its name implies, was comprised of members who were executives of unions representing railway employees -- sought to base its standing solely on injuries that had been suffered by union-member railway employees, none of whom was a member of the RLEA itself. See 808 F.2d at 153, 153 n.8. In a one-sentence footnote, we held that the RLEA had standing under Hunt. See id. at 153 n.8. We did not refer, however, either to the "indicia of membership" test or to the portion of Hunt that discussed it. See id. Instead, we merely cited to the first page of Hunt. Id.

We thus left unclear whether our standing ruling rested on the part of Hunt that addressed when a traditional voluntary membership organization has standing based on a member's standing, see 432 U.S. at 343; see also N.Y. State Club Ass'n, 487 U.S. at 9 (articulating this application of Hunt), or the part of Hunt that applied the "indicia of membership" test, see 432 U.S. at

344-45. That makes it a stretch, in my view, to treat our never-since-cited, one-sentence footnote in RLEA as if it were our last word on the significant jurisdictional question of whether the "indicia of membership" test applies to a voluntary membership organization. See United States v. Vaello-Madero, 956 F.3d 12, 17 (1st Cir. 2020) ("[W]e would be remiss in complying with our own duty were we to blindly accept the applicability of [prior cases] without engaging in a scrupulous inquiry into their relevance, application, and precedential value."), rev'd on other grounds, 596 U.S. 159 (2022); see also Lewis v. Casey, 518 U.S. 343, 352 n.2 (1996) (stating that a prior case reaching the merits did not bind the Court to conclude there was jurisdiction because "standing was neither challenged nor discussed" in the prior case and because "[the Court] ha[s] repeatedly held that the existence of unaddressed jurisdictional defects has no precedential effect" (emphasis added) (citing Fed. Election Comm'n v. NRA Pol. Victory Fund, 513 U.S. 88, 97 (1994))).

Even assuming, though, that RLEA did hold that the "indicia of membership" test applies to such an organization, there still would be the question of whether RLEA establishes that the test is satisfied in a case like this one. I cannot see how it is so clear that RLEA does that La Liga need not make any argument to that effect.

RLEA's members were union executives and so, like La Liga's mayors, were not themselves directly elected to the organization. But, as best I can tell, the RLEA's board was at least controlled by the labor executives. See Brief of Movant-Intervenor RLEA at 1-6, Am. Train Dispatchers Ass'n v. ICC, 26 F.3d 1157 (D.C. Cir. 1994) (No. 92-1397), 1993 WL 13650707, at *1-6 (describing the structure of RLEA). In other words, the injured parties there -- railway employees -- were positioned to exercise control (albeit indirectly through the executives' unions) over the members of the organization who themselves controlled its decisions much as the apple growers and dealers in Hunt were positioned to exercise control over the commissioners who in turn controlled the Commission. La Liga's complaint says not a word, however, about the role that any of its member-mayors plays in deciding the course of action that the organization may take, including with respect to important decisions such as bringing a suit like this one.

Nor did RLEA, like Hunt, have any occasion to consider the special questions concerning democratic control over government executives that a case such as this one implicates. That case at most implicated private organizational bylaws, not democratically chosen structures of government control. For this reason, too, I cannot see how RLEA so clearly supports La Liga's standing here that it can save the day.

- 82 -

**VI.**

The majority emphasizes that <u>Hunt</u> premised its "indicia of membership" test on the notion that we should not "exalt form over substance."  432 U.S. at 345.  The majority also points out that on a motion to dismiss we must construe the complaint generously, <u>see</u> <u>Tyler</u> v. <u>Hennepin County</u>, 598 U.S. 631, 637 (2023) (citing <u>Lujan</u>, 504 U.S. at 561).  Neither observation persuades me that we may hold that La Liga has standing under the "indicia of membership" test when La Liga has not itself argued that it does.

In admonishing us not to "exalt form over substance," <u>Hunt</u> was using a pithy phrase to warn us not to treat entities that are functionally traditional trade associations differently for purposes of standing from entities that formally are.  <u>See</u> 432 U.S. at 345.  It was not encouraging courts to permit traditional voluntary membership organizations to claim members that they do not have.  I thus do not see how we may treat that admonition as an invitation to permit voluntary membership associations of government officials to sue based on injuries to the member-officials' governments if those officials are not themselves authorized to decide when those governments may sue to redress those injuries.

Likewise, although we must construe complaints generously, <u>see</u> <u>Gustavsen</u> v. <u>Alcon Lab'ys, Inc.</u>, 903 F.3d 1, 7 (1st Cir. 2018), parties still must allege the facts and make the

arguments necessary to establish that we have jurisdiction over their cases, see McBreairty v. Miller, 93 F.4th 513, 518 (1st Cir. 2024).  Yet La Liga's complaint fails to allege many of the facts that Hunt and SFA suggest matter or that would appear to matter even under the more general understanding of the "indicia of membership" test that the majority distills from Hunt.

In any event, our obligation to make reasonable inferences in construing a complaint does not permit us to overlook the party-presentation rule.  See Greenlaw v. United States, 554 U.S. 237, 243 (2008) ("In our adversary system . . . we follow the principle of party presentation.  That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.").  Indeed, that rule serves aims like those that Article III itself serves in requiring courts to resolve concrete disputes between parties rather than "questions in the abstract" that no party has chosen to litigate.  N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1, 25 n.6 (2022).  I thus find it ironic that the majority chooses to premise its Article III jurisdiction here on arguments that no party to this supposed case or controversy has even made.

The majority does point to out-of-circuit authority that it contends permits us to resolve issues relating to standing that were not made below.  See Hartig Drug Co. v. Senju Pharm. Co., 836 F.3d 261, 267-73 (3d Cir. 2016).  But the plaintiff-appellant in

that case had argued on appeal that its complaint's allegations of antitrust injury did suffice to establish Article III standing despite the defendant-appellee's arguments to the contrary. Id. at 271. The reviewing court then agreed with the plaintiff-appellant's contention that those allegations did so. Id. at 272. That the panel went on to consider whether, although the district court had wrongly dismissed the complaint for lack of Article III jurisdiction, dismissal on the merits was still proper based on a ground -- failure to state an antitrust claim -- that the defendant-appellee had not raised on appeal is of no moment here. The problem in our case concerns waiver by the appellant not the appellee. Compare Carrozza v. CVS Pharmacy, Inc., 992 F.3d 44, 59 (1st Cir. 2021) ("[A]ppellants cannot raise an argument on appeal that was not squarely and timely raised in the trial court." (cleaned up)), with United States v. George, 886 F.3d 31, 39 (1st Cir. 2018) ("We are at liberty to affirm a district court's judgment on any ground made manifest by the record, whether or not that particular ground was raised below.").

Indeed, La Liga has not merely failed in its appellate briefing to advance the only theory for our having jurisdiction that the majority embraces. La Liga also has stayed mum about the seeming defect in its standing even though it was asked about that defect at oral argument. See Guar. Nat. Title Co. v. J.E.G. Assocs., 101 F.3d 57, 59 (7th Cir. 1996) ("[I]t is not the court's

obligation to lead counsel through a jurisdictional paint-by-numbers scheme. Litigants who call on the resources of a federal court must establish that the tribunal has jurisdiction, and when after multiple opportunities they do not demonstrate that jurisdiction is present, the appropriate response is clear.").

## VII.

For all these reasons, I would dismiss this complaint on the ground that La Liga has failed to meet its burden to show that it has standing. I therefore respectfully dissent.